**GASTON COUNTY, a political subdivision of the State of North Carolina, Gastonia, North Carolina, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 2196–66.**

United States District Court
District of Columbia.
Aug. 16, 1968.

Grady B. Stott, Gastonia, N. C., and Wesley E. McDonald, Sr., Washington, D.C., for plaintiff.

Asst. Atty. Gen. (at the time the briefs were filed) John Doar and Monica Gallagher and Frank E. Schwelb, Attys., Dept. of Justice, for defendant.

Before WRIGHT and ROBINSON, Circuit Judges, and GASCH, District Judge.

J. SKELLY WRIGHT, Circuit Judge:

Gaston County, North Carolina, brought this action pursuant to Section 4(a) of the Voting Rights Act of 1965, 42 U.S.C. §§ 1973 et seq. (Supp. II 1965–66), seeking a declaratory judgment that, during the past five years, no "test or device" within the meaning of the Act has been used in Gaston County for the purpose or with the effect of denying or abridging the right to register to vote or to vote on account of race or color. Although several other counties and one state covered by the Act have instituted similar actions,[1] this is the first case

1. See Wake County, North Carolina v. United States, D.D.C., Civil Action No. 1198–66 (January 23, 1967) (plaintiff's motion for summary judgment granted with consent of Government); Elmore County, Idaho v. United States, D.D.C., Civil Action No. 320–66 (September 22, 1966) (plaintiff's motion for summary judgment granted with consent of Government); State of Alaska v. United States, D.D.C., Civil Action No. 101–66 (August 17, 1966) (plaintiff's motion for

that has proceeded to trial. Since we are thus presented with a case of first impression as to the application of what has been described as the heart of the Act, we think it desirable, if not necessary, to elaborate in some detail upon our findings, which lead us to conclude that Gaston County is not entitled to the relief requested.

## I

The effect of Section 4(a) of the Voting Rights Act[2] is to suspend the use of tests or devices prescribed by state law as a prerequisite to voting or registering to vote in those states or political subdivisions thereof that are included within Section 4(b)'s coverage formula. Under Section 4(c) the Attorney General designates those states or political subdivisions that on November 1, 1964, employed as a prerequisite to voting a "test or device," which includes "any require- ment that a person * * * (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class." 42 U.S.C. § 1973b (c). Also under Section 4(b) the Director of the Census certifies any state or political subdivision in which the percentage of persons registered to vote, or who did in fact vote, in the presidential election of November 1964 is less than 50 per cent of the persons of voting age residing in the relevant area. Neither the determination by the Attorney General nor that by the Director of the Census is subject to judicial review. When a state or political subdivision is certified by both the Attorney General and the Director of the Census, it is

summary judgment granted with consent of Government); Apache County v. United States, D.D.C., 256 F.Supp. 903 (1966) (plaintiffs' motion for summary judgment granted with consent of Government and motion by Navajo Tribe of Indians and 31 members of Navajo Tribal Council to intervene denied).

2. Section 4 of the Voting Rights Act, 42 U.S.C. § 1973b, provides in pertinent part as follows:

"(a) Action by state or political subdivision for declaratory judgment of no denial or abridgement * * *.

"To assure that the right of citizens of the United States to vote is not denied or abridged on account of race or color, no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device in any State with respect to which the determinations have been made under subsection (b) of this section or in any political subdivision with respect to which such determinations have been made as a separate unit, unless the United States District Court for the District of Columbia in an action for a declaratory judgment brought by such State or subdivision against the United States has determined that no such test or device has been used during the five years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color * * *.

* * * * *

"If the Attorney General determines that he has no reason to believe that any such test or device has been used during the five years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color, he shall consent to the entry of such judgment.

(b) "Required factual determinations necessary to allow suspension of compliance with tests and devices; publication in Federal Register.

"The provisions of subsection (a) of this section shall apply in any State or in any political subdivision of a state which (1) the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which (2) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964.

"A determination or certification of the Attorney General or of the Director of the Census under this section * * * shall be effective upon publication in the Federal Register."

listed in the Federal Register. Suspension of any test or device in that state or political subdivision is then automatic and immediate.

■ A state or political subdivision with respect to which the appropriate determinations have been made may wish to terminate the suspension of its test or device. Accordingly, the Act provides that it may bring suit for a declaratory judgment against the United States in this court,[3] which is directed to be convened as a three-judge court. The requested relief will be granted, thereby permitting the state or subdivision to reinstate its test or device, if the court determines that no such "test or device" has been used anywhere in the territory of that state or subdivision during the five years preceding the filing of the action "for the purpose or with the effect of denying or abridging the right to vote on account of race or color." The state or subdivision bears the burden of proof, but the burden is not an unreasonable one since evidence that a state or political subdivision has engaged in the use of tests or devices for the purpose or with the effect of denying or abridging the right to vote on account of race or color does not preclude reinstatement of the tests or devices if "(1) incidents of such use have been few in number and have been promptly and effectively corrected by State or local action, (2) the continuing effect of such incidents has been eliminated, and (3) there is no reasonable probability of their recurrence in the future."[4] 42 U.S.C. § 1973b(d).

Since the underlying policy and constitutionality of the Voting Rights Act of 1965 in general and Section 4 in particular have been sufficiently explored elsewhere,[5] a detailed account of the Act's legislative history need not be recited here. Suffice it to say that Congress conducted exhaustive hearings which established quite clearly that the evils Congress tried to eliminate by its enactment of the Civil Rights Acts of 1957, 1960 and 1964 continued unabated in 1965, albeit perhaps in different forms. On the basis of these hearings, Congress concluded that the remedies it had previously provided—principally creating causes of action and authorizing standing to sue—were insufficient to rectify the situation and that it was necessary to depart from the use of the judicial process as the primary means of enforcing Fifteenth Amendment rights. Accordingly, Congress made its own findings of fact and from these findings it drew a logical inference—that is, the coexistence of low registration or voting and a test or device implied that the test or device was discriminatory in purpose or effect. Section 4(b)'s provisions defining those areas to be covered by the Act embody this presumption of discrimination.

## II

Suit was filed in the present case on August 18, 1966, and the trial was held

---

3. The Act, however, provides that this court shall not issue a declaratory judgment favorable to a state or subdivision thereof "for a period of five years after the entry of a final judgment of any court of the United States, other than the denial of a declaratory judgment under this section, whether entered prior to or after enactment of this [Act], determining that denials or abridgments of the right to vote on account of race or color through the use of such tests or devices have occurred anywhere in the territory of such [state or subdivision thereof]." 42 U.S.C. § 1973b(a).

4. In the event this court renders a judgment favorable to the state or subdivi-

sion, it nevertheless retains jurisdiction of the action for a period of five years and must reopen the case upon a motion by the Attorney General alleging that a test or device has been used for the purpose or with the effect of denying or abridging the right to vote on account of race or color. 42 U.S.C. § 1973b(a).

5. State of South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). See also Bickel, The Voting Rights Cases, 1966 Sup.Ct.Rev. 79; Christopher, The Constitutionality of the Voting Rights Act of 1965, 18 Stan.L.Rev. 1 (1965).

on June 21 and 22, 1967. Certain issues were disposed of by a pretrial stipulation of the parties. Thus it is uncontested that Gaston County, North Carolina, is a political subdivision of the State of North Carolina, that it is divided into 43 election precincts, and that in each precinct there is a registrar of voters who is appointed by, and an employee of, the Gaston County Board of Elections, which board is responsible for the administration of the elective processes.[6] Article VI, Section 4, of the Constitution of North Carolina and Section 163–28 of the North Carolina General Statutes provide that "[e]very person presenting himself for registration shall be able to read and write any section of the Constitution of North Carolina into the English language"; Section 163–28 further provides that "[i]t shall be the duty of each registrar to administer the provisions of this section." The Attorney General of the United States determined that a test or device within the meaning of Section 4(c) of the Voting Rights Act of 1965 was maintained in Gaston County on November 1, 1964. The Director of the Census determined that fewer than 50 per cent of the persons of voting age residing in Gaston County voted in the presidential election of November 1964. These determinations were published in the Federal Register on March 29, 1966. 31 Fed.Reg. 5080–5081.

It is also agreed that in April 1962 the County Board of Elections, pursuant to North Carolina law, adopted a new system of voter registration, known as a permanent loose-leaf system, which required a general reregistration of all voters in Gaston County. Consequently, all persons now eligible to vote have been registered during or since April 1962, so that although the relevant period for purposes of this suit would ordinarily be five years preceding the filing of the action, or from August 18, 1961, we need only concern ourselves with registration activities since April 1962. Finally, the parties have agreed that from April 1962 to the effective date of the Civil Rights Act of 1964 oral literacy tests were used by the registrars, that such tests were replaced by written tests after that date, and that since March 29, 1966, the date on which Gaston County was listed in the Federal Register, literacy tests have not been used in Gaston County.

During the course of the trial, Gaston County presented six witnesses and the depositions of 13 additional witnesses, and introduced into evidence numerous exhibits. The thrust of the accumulated evidence was to show the impartial implementation of the new registration system. Thus there is credible evidence to establish that in April 1962 the number of voting precincts was increased for the convenience of the voters from 35 to 43; that the registration books have been kept open at the principal office of the County Board of Elections from 8:30 A.M. to 5:00 P.M., Monday through Friday[7]; and that registrars have been authorized—indeed encouraged [8]—to be available to register any qualified person at any reasonable hour each day of the week and, in addition, to be at the precinct voting place on designated Saturdays throughout the registration period.[9]

Additional evidence establishes that the adoption of the new system received considerable publicity through the mass

---

6. Registration is conducted both on the precinct level by the registrar serving in each precinct and countywide at the principal office of the Board of Elections located in the city of Gastonia.

7. Such books, however, are required by North Carolina law to be closed for a period of 21 days prior to an election.

8. Registrars are paid a general fee as established by North Carolina law and, in addition, receive a fee for each person they register.

9. This requirement that the registrars be at the voting precincts on Saturdays was motivated by concern for the convenience of the voters of Gaston County and is wholly independent of and in addition to the requirements of North Carolina law generally.

media. Newspaper advertisements, radio announcements and placards explained the mechanics of the new system, the need for registration and the names and addresses of registrars for all of the precincts. These efforts, which were utilized with some success in the April 1962 registration campaign, were repeated in 1964 prior to the general election and were in fact enlarged to include letters distributed to the schoolchildren urging their parents to register to vote.

Plaintiff's evidence also established that these publicity efforts were fairly directed to all persons residing in the county, regardless of race or color, and that special conferences were held with Negro leaders for the specific purpose of obtaining their assistance in informing Negro citizens of where and when to register. Indeed, three of the five commissioners (or so-called deputy registrars) appointed during the April 1962 registration campaign to assist in registration were Negroes. Moreover, there is no evidence that any registrar or member of the Board of Elections advised any Negro that he would be refused registration because of his race. It also appears that the Board of Elections did not receive any complaints from any Negro citizen that he had been denied his right to register because of a test or device.

In its post-trial brief, plaintiff contends that, given the above, it has satisfied its burden of proof and is therefore entitled to a declaratory judgment that no test or device has been used for a period of five years preceding the filing of this action for the purpose or with the effect of denying or abridging the right to vote on account of race or color. Indeed, as plaintiff correctly points out, the Supreme Court, in interpreting the burden placed upon a plaintiff in a Section 4 case, has commented that the state or political subdivision "need do no more than submit affidavits from voting officials, asserting that they have not been guilty of racial discrimination through the use of tests and devices

during the past five years * * *." State of South Carolina v. Katzenbach, 383 U.S. 301, 332, 86 S.Ct. 803, 820, 15 L.Ed.2d 769 (1966).

But the Supreme Court does not stop there and neither can we. The statement quoted above continues: "and then refute whatever evidence to the contrary may be adduced by the Federal Government." Ibid. Accordingly, we must consider the evidence introduced and the arguments presented by the United States, bearing in mind the critical words of Section 4: "no such test or device has been used * * * for the purpose *or* with the effect of denying or abridging the right to vote on account of race or color." (Emphasis added.)

### III

The United States attempted to establish that the literacy test in Gaston County was used both "for the purpose" *and* "with the effect" of denying or abridging the right to register to vote on account of race or color. With respect to the former standard—"for the purpose"—the United States submitted the depositions of 29 illiterate or nearly illiterate whites who testified that they were registered to vote without being required to demonstrate their literacy; indeed, 15 of these people testified that they affirmatively told the registrar that they could not read or write. In addition, the United States submitted a notebook of registration forms which indicates that the 29 persons mentioned above were not the only whites who were permitted to register although they were incapable of satisfying the literacy requirements of North Carolina law.

The United States seemingly admits that this waiver of the literacy requirement which resulted in the registration of a few whites, standing alone, does not necessarily establish that the literacy test was used in Gaston County for the purpose of denying or abridging the right to vote on account of race or color. The United States asserts, however, that this policy of waiver was not

_made public [10] so that Negroes justifiably believed that they would either be required to demonstrate literacy to the satisfaction of the registrar or be embarrassed by being turned away. To support this argument, the United States reminded this court of the purpose for which the literacy test was first adopted in North Carolina and the manner in which it has been applied since its inception.[11] The United States also introduced evidence showing that during the past five years Negro leaders refrained from encouraging illiterate Negroes to attempt to register and that several Negroes who did attempt to register were rejected because of their inability to read or write.

To rebut the Government's evidence and its inferences, Gaston County relies primarily upon the depositions of ten illiterate or nearly illiterate Negroes who were registered despite their admitted inability to comply with North Carolina's literacy requirement. In addition, Gaston County argues that even if the literacy test was used for the purpose of denying or abridging the right to register to vote on account of race or color, incidents of such use have been few in number so as to fall within the exception clause of Section 4(d). Insofar as we are here concerned with that language of the Act which speaks of purposeful discrimination, we must agree that the Gaston County Board of Elections has made commendable efforts to promote registration of all citizens residing in that county, irrespective of race or color. For the reasons hereinafter

stated, however, we find it unnecessary to determine whether purposeful discrimination within the meaning of Section 4(a) has been practiced in Gaston County since April 1962.

IV

Before proceeding to a discussion of the evidence adduced by the United States tending to show that the literacy test was used in Gaston County "with the effect" of abridging the right to register to vote on account of race or color, we believe it expedient to consider another argument of the United States based on the same evidence which was relied upon to establish purposeful discrimination. We refer now to the Government's contention that termination of the suspension of the literacy test in Gaston County would run afoul of Section 101(a) of the Civil Rights Act of 1964, 42 U.S.C. § 1971(a) (2) (A) (Supp. II 1965–66). That section provides that, in determining whether an individual is qualified under state law to vote in any federal election, no person acting under color of law may apply any standard different from or more stringent than the standards which have been applied under such law to other individuals within the political subdivision who have been found qualified to vote. The United States argues that, according to this section, Gaston County may not deny registration to any person on the ground of illiteracy, irrespective of whether or not there has been racial discrimination, so long as illiterates remain on the registration rolls.

10. Indeed, although the paid advertisements of the Gaston County Board of Elections did not state that the literacy test was being enforced, there was considerable publicity, in the form of editorials and public interest stories, of the fact that election officials were enforcing the literacy requirements of North Carolina law, perhaps for the first time on a nondiscriminatory basis. Whatever this shows in the context of purposeful discrimination, such publicity does have significant ramifications with respect to the "effect" of such tests. See Note 21 infra.

11. The adoption of the literacy test was discussed in the Raleigh News and Observer of January 14, 1900, in a story which carried the headline: "WHITE SUPREMACY MADE PERMANENT." The article explained that whites registered before 1908 would be exempted from the literacy requirement (grandfather clause), but that the test would be applied with respect to Negroes so as to "eliminate the baneful and ruinous influence of irresponsible negro suffrage."

It is true that the chairman of the Gaston County Board of Elections testified that he believed that if the literacy test were reinstated the registrars would be bound by North Carolina law to enforce the letter and spirit of the state's literacy requirement. Moreover, he testified that he did not envision either a general reregistration of voters or a purging of illiterates so that if illiterates are presently registered, they will remain eligible to vote. Since there is evidence that in the past illiterates have been permitted to register, we could simply find that, unless the registration rolls are purged of all illiterates, Gaston County cannot, under Section 101(a) of the Civil Rights Act of 1964, reinstate its literacy test. However, since on the record before us we find that the literacy test has been used in Gaston County during the five years preceding the filing of this action "with the effect" of abridging the right to register to vote on account of race or color, we shall not rest on a theory which would be rendered irrelevant if the Gagston County Board of Elections were to decide to purge its rolls.

Moreover, during the hearings on the Voting Rights Act of 1965 before the Judiciary Committee of the House of Representatives, the Attorney General of the United States testified that suspending literacy tests was a more desirable approach than requiring a complete reregistration of all voters. He explained his position as follows:

"To subject every citizen to a higher literacy standard would, inevitably, work unfairly against Negroes—Negroes who have for decades been systematically denied educational opportunity available to the white population.

"Such an impact would produce a real constitutional irony—that years of violation of the 14th amendment right of equal protection through equal education would become the excuse for continuing violation of the 15th amendment right to vote." [12]

We believe that this statement goes to the heart of the problem we face today, particularly if reinstatement of the literacy tests were permitted, and requires us to find that, within the intendment of the Act,[13] the literacy test in Gaston County has been used with the effect of abridging the right to register to vote on account of race or color.

V

The Supreme Court of North Carolina described the state statute requiring a demonstration of literacy as a prerequisite to registering to vote in these words:

" * * * It demands more than the mere ability to write one's own name and to recognize and read a few simple words. * * * The standard or level of performance is the North Carolina

---

12. Hearings before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., p. 16 (1965).

13. Both the Senate and the House of Representatives, in their reports accompanying the bill which eventually became the Voting Rights Act of 1965, speak to this issue and seemingly adopt the position of the Attorney General. Thus the Senate commented:
" * * * [T]he educational differences between whites and Negroes in the areas to be covered by the prohibitions—differences which are reflected in the record before the committee—would mean that equal application of the tests would abridge 15th amendment rights. This advantage to whites is directly attributable to the States and localities involved." 131 Senate Reports, 89th Cong., 1st Sess., No. 162, Part 3, p. 16 (1965), U.S. Code Cong. & Admin.News 1965, p. 2554.
The House agreed:
" * * * [E]ven fair administration of the tests, following decades of discrimination * * * would simply freeze the present registration disparity created by past violations of the [Constitution]. * * * " 162 House Reports, 89th Cong., 1st Sess., No. 439, p. 15 (1965), U.S.Code Cong. & Admin. News 1965, p. 2447.

Constitution. To be entitled to register as an elector one must be able to read and write any section thereof. Admittedly, the standard is relatively high, even after more than a half century of free public schools and universal education. * * *" Bazemore v. Bertie County Board of Elections, 254 N.C. 398, 119 S.E.2d 637, 641 (1961).

If the standard is relatively high "even after more than a half century of free public schools," it must be much more difficult to attain for a person who has been denied the full benefits of such "universal education."

During the entire period when the persons presently of voting age were of school age, the schools in Gaston County were segregated; indeed, those schools remained totally segregated until 1965, when token integration was begun.[14] And not only were the schools segregated—thereby bringing into play the holding of Brown v. Board of Education, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954), that "[s]eparate educational facilities are inherently unequal"—but it appears that the Negro facilities have in fact been of appreciably inferior quality.

The United States introduced evidence which indicates the difference between white and Negro education in Gaston County.[15] The evidence is admittedly fragmentary in nature, but the conclusion is inescapable that proportionately less money has been spent on Negro education than on white. For example, the following chart shows the average annual salary for a white and a Negro school teacher for the years indicated: [16]

| YEAR | WHITE | NEGRO |
|---|---|---|
| 1908–09 | $ 225.28 | $ 91.17 |
| 1918–19 [17] | 566.90 | 113.64 |
| 1928–29 | 1,053.04 | 508.52 |
| 1938–39 | 933.97 | 681.07 |
| 1948–49 | 2,331.01 | 2,324.91. |

Below are the figures for the same years of the value of school property per pupil:

| YEAR | WHITE | NEGRO |
|---|---|---|
| 1908–09 | $ 12.97 | $ 3.90 |
| 1918–19 | 58.84 | 12.74 |
| 1928–29 | 181.03 | 66.20 |
| 1938–39 | 165.28 | 74.71 |
| 1948–49 | 278.39 | 99.60 |

14. The evidence reveals that in Gastonia when, as a result of desegregation, 300 white students were zoned into a school with 300 Negro students, 297 of the white students were transferred out almost immediately.

15. See Defendant's Exhibit No. 2, Excerpts from the Report of the Superintendent of Public Instruction of North Carolina, from which are derived all of the statistics which follow.

16. Although Gaston County would have us direct our attention to its present efforts to equalize opportunities—for education as well as voting—we cannot close our eyes to the fact that the majority of today's voters or potential voters were schoolchildren in 1948, 1938, 1928 and even 1918 and 1908. More specifically, according to the Bureau of the Census, 73% of the Negroes of voting age in 1966 would have been enrolled in school, if at all, prior to 1948–49 and 35% of

the Negroes of voting age would have been of school age prior to 1918–19. See Special Censuses of Selected Counties in North Carolina, 1966 and 1965, p. 8 (Bureau of the Census, Series P–28, No. 1412, May 13, 1966). Since the Negroes' education thus dates back in many instances to 50 or more years ago, we deem it proper and appropriate, in analyzing their present ability to satisfy a literacy requirement, to turn back the clock accordingly. We have not presented the relevant data after the 1948–49 school year, since children entering schools in the 1950's were ineligible on account of age to vote during the five years preceding the filing of this action.

17. North Carolina teachers were not uniformly certified before 1919, but at that time only 40% of the white teachers were unable to qualify for the lowest state certificate whereas almost 80% of the Negro teachers failed to meet this minimum standard.

The value per classroom was also significantly greater for white than for Negro students: [18]

| YEAR | WHITE | NEGRO |
|------|-------|-------|
| 1928–29 | $6,021.24 | $2,464.61 |
| 1938–39 | 4,346.58 | 1,967.25 |
| 1948–49 | 7,765.56 | 2,618.65 |

Assembling the same figures in a slightly different fashion, the following chart shows the percentage of the total elementary and secondary school budget for the items indicated which was directed to the Negro school population. The figures in Columns (3) and (4), showing what percentage of the money allocated to *all* teachers and school property was allocated for Negro teachers and property, should be compared with the figure in Column (2) which represents the percentage of those persons enrolled in school who are Negro.

| (1) | (2) | (3) | (4) |
| | | SALARIES FOR | VALUE OF NEGRO |
| YEAR | NEGRO PUPILS | NEGRO TEACHERS | SCHOOL PROPERTY |
|------|------|------|------|
| 1908–09 | 25.5% | 10.1% | 9.3% |
| 1918–19 | 21.7% | 3.9% | 5.6% |
| 1928–29 | 16.0% | 7.6% | 6.5% |
| 1938–39 | 17.2% | 14.2% | 8.6% |
| 1948–49 | 16.1% | 16.4% | 6.4% |

A reasonable man might anticipate that this disparity between the expenditures for white and Negro pupils would manifest itself in statistics on the respective educational levels attained by the two groups. Such a man would not be disappointed. In Gaston County, according to the 1960 report of the Bureau of the Census, U. S. Census of Population: 1960, Vol. I, Characteristics of the Population, Part 35, North Carolina, pp. 35–252 and 35–287 (1963), 3.2 per cent of the whites over 25 years of age have had no schooling whereas the corresponding figure for Negroes is 6.5 per cent, more than double the white figure. The Census figures for four or less years of education are: 17.4 per cent of the whites over 25 and 30.1 per cent of the Negroes over 25. Indeed, if we look at these statistics from a slightly different angle and use the presumption of literacy embodied in the Civil Rights Act of 1964, that is, a sixth-grade education, we find that 66.4 per cent of the adult white have received "advanced" education whereas only 51.7 per cent of the adult Negroes have gone beyond the sixth grade level.

These and similar statistics support the contention of the United States that Negroes of voting age in Gaston County were, as children, denied a public education equal to that provided white children. Indeed, the education provided many Negroes hardly reached the literacy level.[19] Consequently, we must con-

18. The evidence also shows that in the earlier years Negro schoolhouses tended to be constructed of wood whereas white schoolhouses were built of brick, and that in white schools the pupils had desks rather than the benches provided Negro pupils.

19. One of the six witnesses called by Gaston County was Mr. Thebaud Jeffers, principal of the Negro high school in Gastonia. His testimony was in part as follows:

Q. Mr. Jeffers, do you have an opinion as to whether or not the schools in 1932 had sufficient facilities and were equipped to teach a person to read and write well enough to be able to pass that test or to write any portion of the words of the three sentences that you see there?

A. The Negro schools have been basically concerned—I mean in the early

clude that, in addition to denying Negroes equal educational opportunity as a matter of law through racial segregation, Gaston County has also denied Negroes that same opportunity as a matter of fact. Moreover, since Gaston County has not refuted any of this evidence, State of South Carolina v. Katzenbach, supra,[20] we must agree with the Government's position that any literacy test imposed upon Negroes as a precondition to voting would have the effect of

years—with teaching reading, writing and arithmetic.

All of our schools, just about—I think all of them would have been able to teach any Negro child to read and to write so that he could read a newspaper, so that he could read any simple material that didn't have any foreign words or words of foreign extraction in them.

This has always been true and I don't think that this was ever an argument anywhere, except that maybe the facilities were different.

But they have been basically able to teach this and this is what they have done.

Q. Yes. It is your opinion then that this test could be just copied or written as was required prior to the time we were placed under the '65 Voting Rights Act?

Is that your opinion that a person could do that or—

A. Yes, I am certain.

Q. The schools were sufficient so they could do that?

A. Yes, sir.

Q. All right, sir.

Gaston County relies on this testimony as proof that the educational facilities, albeit segregated, were of sufficient quality to enable Negroes to pass the literacy test. We do not agree. Not only is the testimony itself unpersuasive, but Mr. Jeffers came to Gaston County in 1932 and his knowledge therefore dates only from that time. In addition, in this area the cold statistics and the testimony of persons actually enrolled in the schools during the past 50 years speak louder than mere contemporary conclusions from interested witnesses.

20. As noted above in text, the language of the Supreme Court is quite explicit: "[A]n area need do no more than submit affidavits from voting officials, asserting that they have not been guilty of racial discrimination through the use of tests and devices during the past five years, *and then refute whatever evidence to the contrary* may be adduced by the Federal Government." State of South Carolina v. Katzenbach, supra Note 5, 383 U.S. at 332, 86 S.Ct. at 820. (Emphasis added.) The placing of the burden in a § 4(a) Voting Rights Act case could not be more emphatic—it lies squarely on the certified subdivision.

The concurring opinion is troubled by the fact that "no evidence has been adduced in this case to show that Negro schools in Gaston County were or were not giving their students the very elementary training necessary to pass the Gaston County literacy test"; "[t]here is no proof that had Gaston County schools been integrated, more Negro children would have completed the fourth grade"; "[n]or has it been shown how segregated schools were responsible for the fact that more Negroes than whites in Gaston County attended no school at all." But the Government is not to be faulted for the failure, if any, of such evidence. Rather it is for Gaston County to prove that the segregated Negro schools *were* giving their students the very elementary training necessary to pass the literacy test; that more Negro children would *not* have completed the fourth grade if the schools had been integrated; or that segregated schools were *not* responsible for the fact that more Negroes than whites attended no school at all. The concurring opinion suggests that "[a] more logical inference from this data might be that economic necessity, not segregated schools, compelled the Negro child to participate in an income producing activity for his family at an earlier age, at the expense of formal education," but it is for Gaston County to suggest and support such inferences, not for this court. Gaston County would, of course, also have to show that the economic necessity was not itself the result of segregated education of the Negro parents.

Finally, the concurring opinion "agree[s] that a showing of a discrepancy in formal education between the races may in some circumstances indicate a potential discriminatory effect in the use of a literacy test." Although it taxes the United States with not going further and demonstrating that these "potential" effects are "actual" effects, we believe that the Government has satisfied its burden and that Gaston County has failed to prove that these "potential" effects are *not* "actual" effects.

abridging the right of many Negroes to vote on account of race or color.[21] This conclusion requires that Gaston County's application for a declaratory judgment that it has not used a literacy test during the five years preceding the filing of the action with the effect of abridging the right to register to vote

on account of race or color must be denied.[22]

■ Justice as well as law dictate this result. It would be incongruous to allow a state or county to disenfranchise people for an inability to pass a literacy test, when that ability was denied them as a result of discriminatory state action.[23]

21. One of the Negro leaders testified that she had handpicked the persons they encouraged to attempt to register:

Q. Which people did you pick to take up there to register?

A. People that I thought could read.

Q. Why did you just pick those?

\* \* \* \* \*

A. Well, during that time you had to read the Constitution of the United States, so it was very embarrassing to have some one up there that couldn't read the Constitution and I knew that they would be turned down \* \* \*.

We noted earlier that the fact that the literacy test was to be enforced received considerable publicity in the months that followed the April 1962 re-registration campaign. See Note 10 supra. Consequently, we have such testimony as follows:

Q. Did you learn how to read and write?

A. A little bit; not much.

Q. Did you ever register to vote in Gaston County?

A. No, I never did.

Q. Did you ever try to register to vote?

A. I didn't try.

Q. Why was that?

\* \* \* \* \*

A. After somebody told me I had to be educated. I knowed I couldn't read or write and that's why I didn't register.

22. We find no dearth of authority for the proposition that denial of equal educational opportunities to Negroes limits the discretion of a state or political subdivision with respect to its voting standards. See the dissenting opinion of Judge Brown, generally approved by the Supreme Court, in United States v. State of Mississippi, S.D.Miss., 229 F.Supp. 925, 990–993 (1964) (three-judge court), reversed, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965). See also United States v. State of Texas, W.D.Tex., 252 F.Supp. 234, 241, 245 (three-judge court), affirmed per curiam, 384 U.S. 155, 86 S.Ct. 1383, 16 L.Ed.2d 434 (1966). It is significant that in both of these pre-

Voting Rights Act cases the Government had to bear the burden of proof, whereas in the instant case the burden rests with Gaston County. When one reads the opinions in these cases with this fact in mind, the conclusion is inescapable that there is ample authority for the approach utilized here. Finally, we find that there is nothing to preclude the result we have reached in Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959), which upheld the constitutionality of the very literacy test in question here. In *Lassiter* Mr. Justice Douglas, speaking for the Court, stated:

"Of course a literacy test, fair on its face, may be employed to perpetuate that discrimination which the Fifteenth Amendment was designed to uproot. *No such influence is charged here.* \* \* \*" 360 U.S. at 53, 79 S.Ct. at 991. (Emphasis added.)

23. Plaintiff argues that to deny its application for declaratory judgment solely because the schools in its jurisdiction have been segregated is to attempt to do judicially what Congress chose not to do legislatively. This argument is premised on the following propositions: (1) Congress knew that the educational facilities of the South have been and in many instances remain segregated; (2) Congress would not have provided in § 4(a) that a state or subdivision could terminate the automatic suspension of its test in less than five years unless Congress believed that a state or subdivision would in fact be able to establish to this court's satisfaction that it had not used its test for the purpose or with the effect of denying or abridging the right to vote on account of race or color. There is nothing in the language of the Act or its legislative history to support this argument.

For obvious constitutional reasons, the triggering mechanism of § 4(a) applies equally to all states and subdivisions and to all races. Thus Apache County, Arizona, Elmore County, Idaho, and the State of Alaska were covered by § 4(b), brought suit under § 4(a) to reinstate their tests, and obtained the judgments

Given the congressional purpose of the Voting Rights Act of 1965, we do not believe it is within our power so to reward years of unconstitutional state action against its Negro citizens. Accordingly, the application of Gaston County for a declaratory judgment is

Denied.

GASCH, District Judge (concurring in the result).

Gaston County is a political subdivision of North Carolina, located in the Southern part of the State. The county seat of Gaston County is the City of Gastonia. As of January 24, 1966, approximately one-third of the County's population— 45,429 out of 135,775 persons—lived in Gastonia. The remaining two-thirds lived in small towns and rural areas within the county.

A 1966 Special Census showed that 69,252 white persons and 8,407 Negroes of voting age lived within the County. Of these, 63.3 percent of the white persons (43,874) and 52.2 percent of the Negroes (4,388) were registered to vote in November, 1964. In the general election of November, 1964, only 37,326 people of those registered actually voted, a figure comprising more than 50 percent of the registered voters, but less than 50 percent of the voting age population. Of the registered Negroes, 68.95 percent (3,114) actually voted; of the registered white persons, 80.97 percent actually voted. Therefore, despite the fact that more than 50 percent of Gaston County's voting age population was registered to vote, Gaston County was certified under the Voting Rights Act of 1965. As a result of this certification, all literacy tests in the County were suspended. On August 18, 1966, Gaston County filed this suit in the United States District Court for the District of Columbia.

The majority opinion suggests that the evidence is inconclusive to prove that Gaston County deliberately and purposefully used its literacy test to deny to Negroes their rights to register and vote. I agree. Gaston County's registration practices do not present the kind of clear repressive discrimination against Negroes in the exercise of their franchise that the Act was designed to correct. There is no evidence in Gaston County of large pockets of qualified Negroes who have been discriminated against in their attempts to register and vote. Indeed, there is no evidence of *any* Negro who has been denied registration because of his race. Nor is there evidence of a large discrepancy between percentages of Negroes and whites who were registered to vote. Approximately fifty-two percent of voting age Negroes and sixty-three percent of voting age whites were registered to vote in 1964. There is evidence that some illiterate whites were allowed to register in the County. There is also evidence that some illiterate Negroes were registered. No general pattern or practice was shown.[1] On this record, it would be impossible to find that Gaston County used its literacy test for the purpose of discriminating against Negroes.

I do not concur that there is evidence to sustain the finding of the majority that the test was used with a discriminatory effect.[2] However, I concur in the result the majority reaches because, in my judgment, Gaston County has failed to meet a necessary element of its proof.

they sought. See Note 1 supra. Moreover, we do not rely solely on the fact that the schools in Gaston County have been segregated during the period when persons presently of voting age were of school age, but instead have reviewed the evidence adduced by the Government *in this case* and concluded that the Negro schools were of inferior quality in fact as well as in law. Our decision is thus not an "all encompassing rule" which

binds every political unit presently certified under the Act despite "the merits of any case [it] might present." Concurring opinion p. 695.

1. The evidence offered was that 29 illiterate white persons and 11 illiterate Negroes were registered. Eighty-nine percent of those living in the county of voting age were white.

2. See Part II, infra.

As the majority has pointed out, the Voting Rights Act added a new dimension to voting rights enforcement by presuming discrimination where a literacy test was used and where 50 percent of the voting age population was not registered or did not vote in 1964. In these circumstances, the state or political subdivision was required to rebut this presumption in order to reinstate literacy tests within its borders. The Government was thereby relieved of proving endless individual cases of discrimination in the slow and expensive avenues of court review.

Both the language and the legislative history of the Voting Rights Act of 1965 make it clear that the burden of proof placed on the plaintiff state or political subdivision by the Act involves a showing of nondiscrimination not only in county, state, and national elections, but also in township and municipal elections, and in every other election within the state or political subdivision. Section 4(a) of the Voting Rights Act provides in pertinent part that "no citizen shall be denied the right to vote in any Federal, State, or *local* election because of his failure to comply with any test or device * * * [which has been suspended because of a certification under the Act]." (Emphasis added). The section further states that a county is not eligible for declaratory relief if any court has found within the past five years voter discrimination "anywhere in the territory of such plaintiff." A fair interpretation of the statutory requirement is that all elections, including local elections, must be free of voter discrimination for five years before a literacy test can be reinstated.

In his testimony before the House Judiciary Committee on the Voting Rights bill, former Attorney General Katzenbach emphasized that the bill would apply to every election in the state:

*The Chairman.* This bill covers Federal, State, and municipal elections.

Would it cover an election for a school bond?

*Mr. Katzenbach.* Yes; it would, Mr. Chairman. Every election in which registered electors are permitted to vote would be covered by this bill.[3]

The Attorney General further stated that each certified subsection or state is to be treated as a unit. No subdivision or part of an area that has been certified can come out alone; each certified unit must petition this Court for relief as a whole.[4] Thus, for Gaston County successfully to resist the continued suspension of its literacy test it must show that all elections within the County have been untainted by discrimination. A state would be responsible for all elections at every level within the state if it were petitioner; a county, when certified, faces the burden of showing an absence of discrimination in all of the elections within its territorial limits, including municipal elections.

The record contains no proof concerning municipal election practices within Gaston County. Yet the record does indicate that eleven municipalities in Gaston County hold separate municipal elections. These municipalities conduct their own voter registrations with their own municipal registrars, and apply their own literacy tests and other voting qualifications.

Moreover, such proof was not forthcoming from the present plaintiffs. Two successive Chairmen of the Gaston County Board of Elections testified that the County Board of Elections exercised no control over municipal elections within the County. Mr. William Mack Davis (Chairman from 1960 to 1964) testified that while the Gaston County Board of Elections exercised control over all Federal, State, County, and Township elections, it had no control over any municipal elections in the County.[5] Mr. Lin-

3. Hearings on H.R. 6400, Before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., ser. No. 2 (1965), 21.

4. Id., at 99.

5. Transcript, p. 61.

wood Hollowell, Jr., (Chairman since 1964) confirmed Mr. Davis' testimony:

Q: Now, Mr. Hollowell, when this suit was brought on behalf of Gaston County, I think it has been testified that you have no direct connection with the city registration in the different municipalities in this county.

A: We have no jurisdiction concerning registration or voting in any municipality in our county.

\* \* \* \* \* \*

Q: You don't know whether they comply with the Voting Rights Act, do you?

A: To the best—I don't know. I just don't know. I just have to be honest with you. I have not checked.[6]

Certification of Gaston County under the Voting Rights Act suspended the literacy test for all elections within the County. A judgment for the County in this action would reinstate the literacy test for municipal registrars as well as all others in the County. The County has made no showing that a literacy test has not been used by municipal registrars in Gaston County in a discriminatory fashion. This failure of proof marks a fatal defect in its case. For this reason, I would deny declaratory relief under the Act and accordingly, I concur in the decision of the majority.

## II.

The majority denies declaratory relief to Gaston County on the ground that inferior educational opportunities offered to Negroes in Gaston County's segregated schools places them at a material disadvantage to white persons in passing the Gaston County literacy test; therefore, the test has had a discriminatory effect against Negroes in registering and voting. While I accept the majority's assumption that the quality of education received by Negroes in Gaston County in segregated Negro schools was inferior to that received by white persons in white schools, I am not convinced that, *in the context of Gaston County's literacy test,* this evidence justifies an affirmative finding of a discriminatory effect.

The Gaston County literacy test, as amended in accordance with the Civil Rights Act of 1964, consisted of copying one of three sentences in a space provided under the sentence itself. (The test was orally administered before 1964.) The applicant had his choice as to which of the three sentences he wished to copy. To pass the test, he was not required to spell each word correctly or even to write every word in the sentence, as long as he could print or write a reasonable facsimile of the sentence. He was not asked to interpret or explain the sentence to the registrar. And applicants were given as much time as they needed to complete the test. In some instances, this amounted to an hour or more. There is nothing to indicate that the pre-1964 oral test was administered with any more rigidity.

Given the very low level of competency required by the test, it is not at all clear that even the Negro schools in Gaston County did not provide adequate and sufficient training for Negroes to pass the test. It may well be that even though the Negro student received an inferior education, he was at least equipped to pass this simple test.

The point may be made by analogy. Assume two medical students of equal ability attended two different medical schools, one of which is significantly inferior to the other. As a result, one of the students received a much lower quality education than the other. Because of his inferior educational background, the one who graduated from the second-rate school would probably be at a disadvantage if the two were tested on their respective abilities to diagnose rare diseases, or perform a difficult operation. If the test consisted merely of taking a pulse, or reading a thermometer, however, both might do equally well, despite the disparity in educational background. The latter tests are of such an elementary

6. Transcript, pp. 142–44.

character that both schools would have provided sufficient training to enable their students to pass them.

Similarly, where schools are segregated, it may reasonably be assumed that at any given grade level, Negro students will be less prepared academically than their white counterparts. If Negro and white students are then asked to demonstrate an ability in creative writing, interpretation of language, or higher mathematics, the Negro, who attended inferior schools, would be at a material disadvantage. Where the test consists merely of reading or copying a printed sentence, however, the quality of education each received is less significant in terms of the ability of each to pass it. Both might be prepared to score equally well on the simple test, even though, at the higher levels of achievement, the white student, by reason of his superior education, would be expected to do better.

The point to be made is that no evidence has been adduced in this case to show that Negro schools in Gaston County were or were not giving their students the very elementary training necessary to pass the Gaston County literacy test. Given the low level of achievement called for by the Gaston County test, I think such proof is essential to support the affirmative conclusion which the majority has reached, that the segregated education did in fact have a material impact on the respective abilities of Negroes and whites to pass the test.

To support its finding that there was such an impact, the majority has pointed out that the Gaston County public schools were legally segregated until 1965; and that the annual per-pupil expenditure at the Negro schools was consistently much smaller than that appropriated for the white schools. The majority also cites census data that proportionally fewer Gaston County Negroes than whites over age 25 attained at least a fourth grade education during the period the schools were racially segregated, and that more than twice as many Negroes as

whites in Gaston County received no formal education at all. In my opinion, this evidence is insufficient to support the majority's case. There is no proof that had Gaston County schools been integrated, more Negro children would have completed the fourth grade. Nor has it been shown how segregated schools were responsible for the fact that more Negroes than whites in Gaston County attended no school at all. A more logical inference from this data might be that economic necessity, not segregated schools, compelled the Negro child to participate in an income producing activity for his family at any earlier age, at the expense of formal education.

Footnote 20 emphasizes that the burden of proof is upon the petitioner. It quotes from State of South Carolina v. Katzenbach and in pertinent part emphasizes that petitioner "refute whatever evidence to the contrary may be adduced by the Federal Government."

The critical question then arises: What evidence has the Government adduced that demonstrates that an educational test or device, i. e., copying a single sentence, has the effect of denying or abridging the right to vote? Whatever weight may be accorded the respondent's cold statistics is, in my opinion, dispelled by the testimony of the petitioner's expert witness who expressed the unqualified and unchallenged opinion that the Negro schools prior to integration were sufficient to enable the students to pass the type of test required. There it is important to note that the present test is ability to copy a single sentence. We are not concerned with the prior test which is discussed in Bazemore v. Bertie County Board of Elections, 254 N.C. 398, 119 S.E.2d 637, 641 (1961). Likewise, we are not concerned with conditions in 1900 and attitudes represented therein.[7]

To summarize this point, I agree that a showing of a discrepancy in formal education between the races may in some

---

**7.** See footnote 11 of the majority opinion.

circumstances indicate a potential discriminatory effect in the use of a literacy test.[8] But it is *actual* effects, not *potential* effects, that are proscribed by the Act. I do not feel that the evidence justifies a finding that educational disparities in Gaston County, when viewed in the light of the literacy test actually administered there, had an *actual* discriminatory effect on voter registration.[9]

Several consent judgments have been entered under the Voting Rights Act. One such judgment involved Wake County, North Carolina.[10] In the *Wake County* case, the Attorney General consented to a judgment that no test or device had been used in the past five years with the purpose *or effect* of denying or abridging the right to vote on account of race or color. Wake and Gaston are neighboring counties. The same State literacy test requirement applies to both. The census table on which the majority relies shows that proportionally fewer Negroes than whites in Wake County had fourth grade educations and that many more Negroes than whites had no schooling at all. These considerations lead this Court to strike down a literacy test in Gaston County, but they were not applied to deny Wake County use of its literacy test. Nor was any mention of segregated schools or discrepancies in Negro and white grade level attainment made in Apache County et al. v. United States,[11]

8. For example, where the test requires the registrant to explain the meaning of a section of the Constitution an inferior education could render the Negro at a real disadvantage, because of the high level of competency necessary to pass it.

9. The majority opinion, in footnote 22, cites as support for the proposition that denial of equal educational opportunities to Negroes limits the discretion of a state or political subdivision with respect to its voting standards United States v. State of Texas, 252 F.Supp. 234 (W.D. Tex.1966), affirmed per curiam, 384 U.S. 155, 86 S.Ct. 1383, 16 L.Ed.2d 434 (1966). In that case, the court was asked to find a discriminatory effect in the use of a poll tax on the ground that Negroes, deprived of an equal educational opportunity, were less able to succeed financially and therefore less able to pay the tax required to vote. As the majority opinion is essentially a holding that Negroes, deprived of an equal educational opportunity in Gaston County, were less able to pass the test required to vote, I consider the two cases similar in theory. The court in the *Texas* case declined to find discrimination on the evidence submitted. The holding of that court precisely expresses my concern over the sufficiency of the evidence in the case at bar:

"The evidence clearly shows, and the United States does not dispute, that as [sic] least during the last twenty years there has not been any attempt to use the poll tax overtly to deprive the Negro of his right to vote. Despite unlimited pretrial discovery, no instances of outright discrimination have been shown or alleged. In fact, the United States has relied primarily on evidence of discrimination in public education and the resulting economic disadvantages to establish that the poll tax is more of a burden upon the Negro than upon the white voter. Although we consider the United States' method of proof a legitimate means for reaching such a conclusion, the facts will not support a finding of racial discrimination. The figures most favorable to the United States' position indicate that of the eligible persons between the ages of 21 and 60, 57.3% of the whites and 45.3% of the Negroes pay their poll tax. It is to be noted that both of these figures, although not commendable in terms of the total electorate, are substantial [sic] and that the difference between them is only 12%. If the disparity had been larger, we might have been more inclined to accept the evidence of a historical background of discrimination and the result of the poll tax sales as sufficient to justify a finding that the poll tax discriminates against Negroes. The disparity, however, is not glaring. Indeed, it is relatively small. The evidence points to other possible reasons for this difference." 252 F.Supp. at 245.

The factual parallel between the *Texas* case and the case at bar is highly significant, particularly regarding the absence of proof of outright discrimination and the similar percentages of Negroes and whites who were registered to vote.

10. Civil Action No. 1198–66 (January 23, 1967).

11. 256 F.Supp. 903 (1966).

State of Alaska v. United States,[12] or Elmore County, Idaho v. United States,[13] the other consent judgments entered under the Voting Rights Act. The majority opinion seems, then, to impose a different and more difficult burden of proof in the case of Gaston County than the Department of Justice or this Court has applied to any other case under the Voting Rights Act.[14]

I am also concerned that the majority's opinion seems to preclude any showing by any Southern state or political subdivision to reinstate its literacy test before the five-year suspension period has expired. Because the decision of the majority in this case is so broad and so far-reaching, it will have the effect of disqualifying any political unit presently certified under the Act from obtaining a delaratory judgment before five years of suspension of its literacy test have elapsed. These units are not denied declaratory relief on the merits of any case they might present; they are now bound by an all encompassing rule, the soundness of which they had no opportunity to contest, which presents a burden of proof that will be impossible for them to meet.

From the President's Message to the Congress proposing the Voting Rights Act,[15] and the hearings [16] and floor debate [17] in the Congress, it is clear that the Voting Rights Act was primarily directed at the Southern states. In the Act, the Congress allowed a fair opportunity for a certified unit to rebut the presumption that its literacy test was used in a discriminatory manner. Thus, sections 4 and 5 of the Act provide a procedure whereby a State or political subdivision which has been the subject of a certification under the Act, may petition this Court for declaratory relief to reinstate its test before the five-year suspension period has elapsed. Sections 4 and 5 will provide no remedy to a Southern state, however, if, as the majority finds, a segregated school system coupled with census data showing higher literacy and education for whites than for Negroes, is sufficient to preclude recovery under the Act. We can take judicial notice that the segregated school system was the prevailing system throughout the South. If this were what Congress had in mind, it would have stated that no test could be used where literacy was higher among whites than among Negroes. I do not believe that Congress intended that the Act be interpreted in such a way as to render §§ 4 and 5 inapplicable to Southern states or those which had segregated educational systems. To the extent the majority opinion reaches this result, it is not, in my judgment, in accord with the intent of Congress.

For the reasons hereinabove stated, I concur in the result, but not the grounds of decision of the majority.

12. Civil Action No. 101–66 (August 17, 1966).

13. Civil Action No. 320–66 (September 22, 1966).

14. One other case cited by the majority as support for the proposition that denial of equal educational opportunities may affect permissible voting standards is United States v. State of Mississippi, 229 F.Supp. 925 (S.D.Miss. 1964), reversed, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965). In that action for injunctive relief, the United States sought to have registered "any Negro applicant who is over age 21, *able to read,* a resident for the period of time prescribed by state law, and not disqualified by state laws disfranchising the insane and certain convicted criminals." (See 380 U.S. at 135, 85 S.Ct. at 812, emphasis supplied). While that case did not involve the statute under consideration here, the relief sought even in those aggravated circumstances should be considered as part of the context of the case.

15. 111 Cong.Rec. 4924 (daily ed. March 15, 1965).

16. See generally, Hearings on H.R. 6400 Before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., ser. 2, (1965); Hearings on S. 1564 Before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., (1965).

17. See generally, Cong.Rec., 89th Cong., 1st Sess., (April 13—May 26, 1965) (Senate); Cong.Rec., 89th Cong., 1st Sess., (July 6—July 9, 1965) (House).