# GASTON COUNTY, NORTH CAROLINA *v.* UNITED STATES.

No. 701.   Argued April 23–24, 1969.—Decided June 2, 1969.

286

*Grady B. Stott* argued the cause for appellant. With him on the brief was *Wesley E. McDonald, Sr.*

*Louis F. Claiborne* argued the cause for the United States. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Leonard, Francis X. Beytagh, Jr.,* and *David L. Norman.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

The Voting Rights Act of 1965 suspends the use of any test or device[1] as a prerequisite to registering to vote in any election, in any State or political subdivision which, on November 1, 1964, maintained a test or device, and in which less than 50% of the residents of voting age were registered on that date or voted in the 1964 presi-

---

[1] "The phrase 'test or device' shall mean any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class." Voting Rights Act of 1965, § 4 (c), 79 Stat. 438, 42 U. S. C. § 1973b (c) (1964 ed., Supp. III).

dential election.[2] Suspension is automatic upon publication in the Federal Register of determinations by the Attorney General and the Director of the Census, respectively, that these conditions apply to a particular governmental unit. If the unit wishes to reinstate the test or device, it must bring suit against the Government in a three-judge district court in the District of Columbia and prove "that no such test or device has been used during the five years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color," § 4 (a). The constitutionality of these provisions was upheld in *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966).

On March 29, 1966, the Attorney General and the Director of the Census published the necessary determinations with respect to appellant, Gaston County, North Carolina. Use of the State's literacy test[3] within the County was thereby suspended. On August 18, 1966, appellant brought this action in the District Court, making the requisite averments and seeking to reinstate the literacy test.

The United States opposed the granting of relief on the ground, *inter alia,* that use of the test had "the effect of denying or abridging the right to vote on account of race or color" because it placed a specially onerous burden on the County's Negro citizens for whom the County had maintained separate and inferior schools.

---

[2] § 4 (a), 79 Stat. 438, 42 U. S. C. § 1973b (a) (1964 ed., Supp. III).

[3] N. C. Const., Art. VI, § 4, provides: "Every person presenting himself for registration shall be able to read and write any section of the Constitution in the English language." At all times relevant to this case, N. C. Gen. Stat. § 163–28 mirrored the constitutional provision. In 1967 the statute was renumbered § 163–58 and its wording was amended in minor aspects.

After a full trial on this and other issues, the District Court denied the relief requested, holding that appellant had not met its burden of proving that its use of the literacy test, in the context of its historic maintenance of segregated and unequal schools, did not discriminatorily deprive Negroes of the franchise.[4] *Gaston County v. United States*, 288 F. Supp. 678 (1968). The court made clear:

> "[W]e do not rely solely on the fact that the schools in Gaston County have been segregated during the period when persons presently of voting age were of school age, but instead have reviewed the evidence adduced by the Government *in this case* and concluded that the Negro schools were of inferior quality in fact as well as in law." *Id.*, at 689–690, n. 23.

Pursuant to § 4 (a) of the Act, the County appealed directly to this Court. We noted probable jurisdiction, 393 U. S. 1011 (1969), and we affirm for substantially the reasons given by the majority in the District Court.

Appellant contends that the decision of the District Court is erroneous on three scores: first, as a matter of statutory construction and legislative history, the court could not consider Gaston County's practice of educational discrimination in determining whether its literacy test had the effect of discriminatorily denying the franchise; second, on the facts of this case, appellant met its burden of proving that the education it provided had no such effect; and third, whatever may have been the situation in the past, Gaston County has not fostered discrimination in education or voting in recent years. We consider these arguments in turn.

---

[4] Judge Wright wrote the majority opinion, in which Judge Robinson joined. Judge Gasch dissented from the court's holding, see *infra*, at 290–291, but would have denied appellant relief for different reasons.

## I.

The legislative history of the Voting Rights Act of 1965 discloses that Congress was fully cognizant of the potential effect of unequal educational opportunities upon exercise of the franchise. This causal relationship was, indeed, one of the principal arguments made in support of the Act's test-suspension provisions. Attorney General Katzenbach testified before the Senate Committee on the Judiciary:

> "It might be suggested that this kind of [voting] discrimination could be ended in a different way—by wiping the registration books clean and requiring all voters, white or Negro, to register anew under a uniformly applied literacy test.
>
> ". . . [S]uch an approach would not solve, but would compound our present problems.
>
> "To subject every citizen to a higher literacy standard would, inevitably, work unfairly against Negroes—Negroes who have for decades been systematically denied educational opportunity equal to that available to the white population. Although the discredited 'separate but equal' doctrine had colorable constitutional legitimacy until 1954, the notorious and tragic fact is that educational opportunities were pathetically inferior for thousands of Negroes who want to vote today.
>
> "The impact of a general reregistration would produce a real irony. Years of violation of the 14th amendment, right of equal protection through equal education, would become the excuse for continuing violation of the 15th amendment, right to vote." Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 22.

Mr. Katzenbach testified similarly before the House Committee. See Hearings on H. R. 6400 before Sub-

committee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., 18–19, 49. And significantly, the Report of the Senate Judiciary Committee explicitly asserted:

> "[T]he educational differences between whites and Negroes in the areas to be covered by the prohibitions—differences which are reflected in the record before the committee—would mean that equal application of the tests would abridge 15th amendment rights. This advantage to whites is directly attributable to the States and localities involved." S. Rep. No. 162, pt. 3, 89th Cong., 1st Sess., 16.[5]

Appellant's response to this seemingly unequivocal legislative history is, in essence, that it proves too much. As Judge Gasch put it in his separate opinion below:

> "[I]t is clear that the Voting Rights Act was primarily directed at the Southern states. In the Act, the Congress allowed a fair opportunity for a certified unit to rebut the presumption that its literacy test was used in a discriminatory manner. Thus, sections 4 and 5 of the Act provide a procedure whereby a State or political subdivision which has been the subject of a certification under the Act, may petition this Court for declaratory relief to reinstate its test before the five-year suspension period

---

[5] In view of this obvious relationship, and acknowledgment of it by the Attorney General and Congress, it is of no consequence that the Act was explicitly designed to enforce the Fifteenth, and not the Fourteenth, Amendment. See, e. g., Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 141–142; Hearings on H. R. 6400 before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., 49–50, 66, 102. The Act was, of course, concerned solely with voting rights, and discrimination in education bears on the Act only insofar as it may result in discriminatory abridgment of the franchise.

has elapsed. Sections 4 and 5 will provide no remedy to a Southern state, however, if, as the majority finds, a segregated school system coupled with census data showing higher literacy and education for whites than for Negroes, is sufficient to preclude recovery under the Act. We can take judicial notice that the segregated school system was the prevailing system throughout the South. If this were what Congress had in mind, it would have stated that no test could be used where literacy was higher among whites than among Negroes. I do not believe that Congress intended that the Act be interpreted in such a way as to render §§ 4 and 5 inapplicable to Southern states or those which had segregated educational systems." 288 F. Supp., at 690, 695.

Appellant's contentions fundamentally misconceive the import of the majority opinion below, as we read it. That opinion explicitly disclaims establishing any *per se* rule. The court's decision is premised not merely on Gaston County's historic maintenance of a dual school system, but on substantial evidence that the County deprived its black residents of equal educational opportunities, which in turn deprived them of an equal chance to pass the literacy test. Consistent with the court's holding, a State or subdivision may demonstrate that although its schools suffered from the inequality inherent in any segregated system, see *Brown* v. *Board of Education*, 347 U. S. 483 (1954), the dual educational system had no appreciable discriminatory effect on the ability of persons of voting age to meet a literacy requirement.

It is of no consequence that Congress *might* have dealt with the effects of educational discrimination by employing a coverage formula different from the one it enacted. The coverage formula chosen by Congress was designed to

be speedy, objective, and incontrovertible; [6] it is triggered appropriately by voting or registration figures. The areas at which the Act was directed

> "share two characteristics incorporated by Congress into the coverage formula: the use of tests and devices for voter registration, and a voting rate in the 1964 presidential election at least 12 points below the national average. Tests and devices are relevant to voting discrimination because of their long history as a tool for perpetrating the evil; a low voting rate is pertinent for the obvious reason that widespread disenfranchisement must inevitably affect the number of actual voters. Accordingly, the coverage formula is rational in both practice and theory." *South Carolina* v. *Katzenbach,* 383 U. S. 301, 330 (1966).

In contrast, a coverage formula based on educational disparities, or one based on literacy rates, would be administratively cumbersome: the designation of racially disparate school systems is not susceptible of speedy, objective, and incontrovertible determination; and the Bureau of the Census collects no accurate county statistics on literacy. Furthermore, a coverage formula based on either of these factors would not serve as an appropriate basis for suspending all of the tests and devices encompassed by § 4 (c) of the Act—for example, a "good moral character" requirement.[7]

---

[6] Section 4 (b) of the Act makes the determinations by the Attorney General and the Director of the Census unreviewable in any court. "[T]he findings not subject to review consist of objective statistical determinations by the Census Bureau and a routine analysis of state statutes by the Justice Department. These functions are unlikely to arouse any plausible dispute." *South Carolina* v. *Katzenbach,* 383 U. S. 301, 333 (1966).

[7] See n. 1, *supra;* Hearings on H. R. 6400 before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., 30–31.

We conclude that in an action brought under § 4 (a) of the Voting Rights Act of 1965, it is appropriate for a court to consider whether a literacy or educational requirement has the "effect of denying . . . the right to vote on account of race or color" because the State or subdivision which seeks to impose the requirement has maintained separate and inferior schools for its Negro residents who are now of voting age.[8]

## II.

In an action for declaratory relief under § 4 (a) of the Voting Rights Act of 1965, the plaintiff carries the burden of proof. The plaintiff cannot be expected to raise and refute every conceivable defense, however, cf. Federal Rules of Civil Procedure, Rule 9 (c), and it was incumbent upon the Government in the case at bar to put into issue its contention that appellant's use of the literacy test, coupled with its racially segregated and unequal school system, discriminatorily deprived Negroes of the franchise. The plaintiff-appellant would then have the burden of proving the contrary. See *South Carolina* v. *Katzenbach,* 383 U. S. 301, 332 (1966). The Government did place this contention in issue, and in support thereof it introduced considerable evidence, which we now summarize.

All persons of voting age in 1966 who attended schools in Gaston County [9] attended racially separate and un-

---

[8] We have no occasion to decide whether the Act would permit reinstatement of a literacy test in the face of racially disparate educational or literacy achievements for which a government bore no responsibility.

[9] We assume, and appellant does not suggest otherwise, that most of the adult residents of Gaston County resided there as children. Cf. Bureau of the Census, 1960 Census of Population, Vol. I, pt. 35, table 39. It would seem a matter of no legal significance that they may have been educated in other counties or States also maintaining segregated and unequal school systems.

equal schools.[10]   Between the years 1908 and 1929, when approximately 45% of the voting age population was of school age, the salaries of Negro teachers in the County ranged from a low of about 20% to a high of about 50% of those of their white colleagues.   In 1919, when uniform teacher certification was first required in North Carolina, 98% of the white teachers, but only 5% of the Negro teachers, qualified for regular state teaching certificates.   The remaining 95% of the Negro teachers held "second grade" certificates.   The Biennial Report of the State Superintendent of Public Instruction, 1918–1920, described a second grade certificate as "the lowest permit issued to any teacher in the State.   It is not a certificate in the proper sense, but merely a permit to teach until someone can be found who is competent to take the place."

During this same period, the per-pupil valuation of Negro school property in the County ranged from 20% to about 40% of that of the white schools.   A much higher proportion of Negro than of white children attended one-room, one-teacher, wooden schoolhouses which contained no desks.

By the 1938–1939 school year, Negro teachers' salaries had increased to about 70% of that of white teachers, and by the 1948–1949 school year, salaries were almost equal.   At this later date, the per-pupil valuation of Negro school property was still only about one-third that of the white schools.

Of those persons over 25 years old at the time of the 1960 census, the proportion of Negroes with no schooling

---

[10] *Gaston County* v. *United States,* 288 F. Supp. 678, 686 (1968). Unless otherwise indicated, the facts and statistics set out below, which are not controverted, appear in the opinion of the District Court, 288 F. Supp., at 686–687, or in Government's Exhibit No. 2 (Excerpts from the Reports of the Superintendent of Public Instruction of North Carolina).

whatever was twice that of whites in Gaston County; the proportion of Negroes with four or less years of education was slightly less than twice that of whites.

In 1962, Gaston County changed its system of registration and required a general reregistration of all voters. North Carolina law provides that "[e]very person presenting himself for registration shall be able to read and write any section of the Constitution in the English language." N. C. Const., Art. VI, § 4; see n. 3, *supra.* The State Supreme Court has described this requirement as "relatively high, even after more than a half century of free public schools and universal education," *Bazemore* v. *Bertie County Board of Elections,* 254 N. C. 398, 402, 119 S. E. 2d 637, 641 (1961),[11] and a Negro minister active in voter registration testified that it placed an especially heavy burden on the County's older Negro citizens. Appendix 131–132. It was publicized throughout the County that the literacy requirement would be enforced. A registrar told a Negro leader not to bring illiterates to register. Some Negroes who attempted to register were, in fact, rejected because they could not pass the test, and others did not attempt to register, knowing that they could not meet the standard.

With this evidence, the Government had not only put its contention in issue, but had made out a prima facie case. It is only reasonable to infer that among black children compelled to endure a segregated and inferior education, fewer will achieve any given degree of literacy than will their better-educated white contemporaries.[12] And on the Government's showing, it was certainly proper

---

[11] Elsewhere in its opinion, the court stated that a registrant must be able to read aloud, as well as copy, a section of the State Constitution. 254 N. C., at 404, 119 S. E. 2d, at 642. Appellant's registrars required only that a registrant copy one of three sentences of the Constitution.

[12] This is, indeed, an inference that appears throughout the Act's legislative history. See *supra,* at 289–290.

to infer that Gaston County's inferior Negro schools provided many of its Negro residents with a subliterate education, and gave many others little inducement to enter or remain in school.

The only evidence introduced by the appellant in rebuttal was the testimony of Thebaud Jeffers, a Negro principal of a Negro high school, who had first come to Gaston County in 1932. He stated that "[a]ll of our schools . . . would have been able to teach any Negro child to read and write so that he could read a newspaper, so that he could read any simple material," and so that he could pass the literacy test. Appendix 169.

The District Court characterized Mr. Jeffers as an "interested witness," and found his testimony "unpersuasive" when measured against the Government's evidence. The court further noted that the principal's knowledge about the school system dated only from 1932, by which time some of the more blatant educational disparities were being reduced. Almost one-half of the county's black adults were of school age well before Mr. Jeffers' arrival.

The District Court concluded that appellant had not met the burden imposed by § 4 (a) of the Voting Rights Act of 1965. This was not clearly erroneous.

### III.

Appellant urges that it administered the 1962 reregistration in a fair and impartial manner, and that in recent years it has made significant strides toward equalizing and integrating its school system. Although we accept these claims as true, they fall wide of the mark. Affording today's Negro youth equal educational opportunities will doubtless prepare them to meet, on equal terms, whatever standards of literacy are required when they reach voting age. It does nothing for their parents, however. From this record, we cannot escape the sad

truth that throughout the years Gaston County systematically deprived its black citizens of the educational opportunities it granted to its white citizens. "Impartial" administration of the literacy test today would serve only to perpetuate these inequities in a different form.

The judgment of the District Court is

*Affirmed.*

MR. JUSTICE BLACK dissents for substantially the same reasons he stated in § (b) of his separate opinion in *South Carolina* v. *Katzenbach,* 383 U. S. 301, 355, 358.