Edmund M. ABORDO, Plaintiff,

v.

STATE OF HAWAII, et al., Defendants.

No. 94–00514 ACK/BMK.

United States District Court,
D. Hawaii.

Aug. 25, 1995.

Edmund M. Abordo, Aiea, HI, pro se.

Michael S. Vincent, Office of the Attorney General—State of Hawaii, Honolulu, HI, for defendants.

Karen A. Essene, Honolulu, HI, for amicus curiae American Civil Liberties Union of Hawaii.

Michael Chun, United States Attorneys Office, Honolulu, HI, Janis C. Kestenbaum, U.S. Department of Justice, Washington, DC, for intervenor U.S.

### ORDER MODIFYING IN PART AND ADOPTING IN PART THE MAGISTRATE'S FINDINGS AND RECOMMENDATION

KAY, Chief Judge.

#### BACKGROUND

On July 6, 1995, Plaintiff Edmund M. Abordo, an inmate at Halawa Correctional

Facility, filed a 42 U.S.C. § 1983 civil rights complaint against various prison officials ("Defendants"). In his complaint, Plaintiff alleges that Defendants violated the Religious Freedom Restoration Act ("RFRA")[1] and deprived him of his rights guaranteed by the First, Fifth and Fourteenth Amendments to the Constitution by cutting his hair despite his objections. In addition, Plaintiff alleges violation of state regulatory law as well as state tort claims of intentional infliction of emotional distress and negligence. On October 3, 1994, Defendant John Smythe filed an answer to the complaint. The remaining Defendants filed an answer on November 25, 1994.

Plaintiff filed a motion for summary judgment on October 25, 1994, asserting that Defendants' policy of not excepting prisoners' hair length or beards from the prison grooming standards based on religious reasons failed to satisfy the compelling standard of the RFRA. In the alternative, Plaintiff argues that Defendants failed to establish that their policy had a logical connection to a legitimate governmental interest.

Defendants filed a counter motion for summary judgment on January 30, 1995. Defendants contend that the RFRA is unconstitutional and therefore has no bearing on this case. Defendants further request summary judgment on Plaintiff's First Amendment claim based on this Court's previous ruling that the prison's grooming policy is constitutional under the pre-RFRA standard. *See Allen v. Sakai*, Civil No. 86–00577 ACK. Defendants also request that the Court grant summary judgment in their favor on (1) Plaintiff's state law claims based on the Eleventh Amendment; (2) Plaintiff's due process claims because Plaintiff has not established a protected liberty interest; (3) Plaintiff's claims against Defendants Mello and Dunnaway because they were not involved in the incident; (4) Plaintiff's claims against supervisory Defendants because there is no respondeat superior liability under § 1983; (5)

Plaintiff's claims against all Defendants based on qualified immunity; and (6) Plaintiff's claims against Defendants in their official capacity based on the Eleventh Amendment.[2]

After consideration of Plaintiff's and Defendants' cross motions for summary judgment, the Magistrate Judge recommended that Plaintiff's motion for summary judgment be denied and that Defendants' cross motion be granted in part and denied in part.

Plaintiff filed objections to the Magistrate Judge's recommendation on June 8, June 15 and July 5, 1995. In his first objection, Plaintiff complains that Defendants' motion for summary judgment was "tainted with false evidence" and requests that the Court "reconsider and evaluate the defendants['] false documents." In his second filing, Plaintiff objects to the Magistrate Judge's finding that Defendants are entitled to qualified immunity and that some of the Defendants are not liable because they were not directly involved in the incident. In his third objection, Plaintiff contends that the Magistrate Judge erred (1) by not taking every allegation of the complaint as true because Plaintiff filed his motion for summary judgment prior to Defendants' filing of their answer; (2) by assessing credibility; (3) in attacking the construction of his pleadings; and (4) by using the wrong grooming policy.

Defendants filed a Statement of Objections on June 12, 1995. Defendants contend that the Magistrate Judge erred in upholding the RFRA. On June 29, 1995, the United States, intervenor in this action, filed a response to Defendants' objection.

### ·STANDARD OF REVIEW

■ Any party may object to a magistrate's case dispositive proposed order, findings, or recommendation. 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b); Local Rule 404–2. The district court must make a

---

1. Pub.L. No. 103–141, 107 Stat. 1488 (1993), *codified at* 42 U.S.C. § 2000bb.

2. In their brief, Defendants also argued that any claim involving a conflict between the prison's grooming policy and Plaintiff's religious practices is moot because Defendants amended the

grooming policy prior to the filing of this action. At the hearing, however, Defendants relinquished this argument, asserting that they plan on returning to their prior policy once the current action is resolved.

*de novo* determination of those portions of the magistrate's findings to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate. *Id. De novo* review means the court must consider the matter anew, the same as if it had not been heard before and as if no decision previously had been rendered. *Ness v. Commissioner,* 954 F.2d 1495, 1497 (9th Cir.1992). Thus, although the district court need not hold a *de novo* hearing, the court's obligation is to arrive at its own independent conclusion about those portions of the magistrate's findings or recommendation to which objections are made. *United States v. Remsing,* 874 F.2d 614, 617 (9th Cir.1989).

■ The court may accept those portions of the magistrate's findings and recommendation which are not objected to if it is satisfied that there is no clear error on the face of the record. *See Campbell v. United States District Court,* 501 F.2d 196, 206 (9th Cir.1974).

## DISCUSSION

### I. PLAINTIFF'S OBJECTIONS

#### A. *Miscellaneous Objections*

Plaintiff contends that Defendants supported their motion for summary judgment with false evidence and that the Magistrate Judge erred in assessing the credibility of the evidence. As Plaintiff correctly notes in his objection filed July 5, 1995, determining the credibility of the evidence is a function of the jury. Where the parties submit different versions of material facts, there is a genuine issue for trial.

The Court finds that the Magistrate Judge did not improperly assess the credibility of the evidence. With respect to Plaintiff's claims under the RFRA, the Magistrate Judge found that there were genuine factual disputes regarding whether Plaintiff's exercise of his religion was substantially burdened. In so doing, the Magistrate Judge did not assess the credibility of the evidence submitted by Plaintiff and Defendants but rather found there were factual discrepancies which would need to be resolved at trial. All other findings by the Magistrate Judge were based on Plaintiff's failure to allege facts sufficient to support his claims. These findings were thus based on the Magistrate Judge's conclusion that no jury could have found in Plaintiff's favor and did not require the Magistrate Judge to assess the credibility of the evidence. Moreover, the Magistrate Judge's recommendation that Defendants' motion for summary judgment be granted in part was not based on the evidence Plaintiff alleges to be false. Plaintiff suggests that certain prison logs attached to Defendants' motion have been tampered with. These logs were not a determinative factor in the Magistrate Judge's rulings.

■ The Court finds no merit in Plaintiff's contention that the Court must consider every allegation of his complaint as true simply because Plaintiff filed his motion for summary judgment prior to the date Defendants filed an answer to his complaint. With respect to each motion, the allegations and evidence must still be viewed in a light most favorable to the nonmoving party. *T.W. Electrical. Serv. v. Pacific Elec. Contractors Assoc.,* 809 F.2d 626, 630–31 (9th Cir.1987). However, the nonmoving party may not avoid summary judgment by relying on the mere allegations in his pleadings. *T.W. Electrical. Serv.,* 809 F.2d at 630.

#### B. *Construction of Plaintiff's Claims*

Plaintiff contends that the Magistrate Judge improperly "attacked" the construction of his pleadings. The Court has reviewed Plaintiff's complaint, the evidence submitted in this case, and the Magistrate Judge's findings and recommendation and finds that the Magistrate Judge went to great lengths to liberally construe Plaintiff's complaint. The Magistrate Judge interpreted Plaintiff's complaint to include claims under the RFRA, the Due Process Clause, the Equal Protection Clause, state statutory law and state common law. The Court will now consider the Magistrate Judge's treatment of each of those claims.

#### 1. **Religious Freedom Restoration Act**

■ In deciding that Plaintiff's claim under the RFRA survived Defendants' motion

for summary judgment, the Magistrate Judge clearly viewed Plaintiff's allegations in a light most favorable to Plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Wileman Brothers & Elliott, Inc. v. Giannini,* 909 F.2d 332, 334 (9th Cir.1990). To prevail on his constitutional claims, Plaintiff must prove that the government's action prevented him from engaging in conduct or having a religious experience which his faith mandates. *Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir.1995). "This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine." *Id.*

To support his claim that the prison's policy of cutting his hair substantially burdened his right to freely exercise his religion, Plaintiff has stated only that: (1) long hair is religiously significant to native Americans because it symbolizes manhood and personal spiritual strength; (2) his "hair was to be used as a sacrifice to render answered prayers;" (3) long hair is significant to Christianity by being Christ-like. Viewed in light of the above standard, Plaintiff's claim that the government substantially burdened the exercise of his religion appears weak. Yet, construing the allegations liberally in Plaintiff's favor, the Magistrate Judge found that a trier of fact could determine that the government prevented Plaintiff from engaging in conduct central to his religion by cutting his hair and therefore refrained from granting summary judgment in Defendants' favor on this claim.

**2. Due Process Clause**

The Court has also reviewed Plaintiff's Due Process claim and agrees that this claim cannot survive Defendants' motion for summary judgment. The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liber-

ty and property. *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Although courts have long recognized that state prison regulations may give rise to liberty interests that are protected by the Fourteenth Amendment, *Meachum v. Fano,* 427 U.S. 215, 223–27, 96 S.Ct. 2532, 2538–40, 49 L.Ed.2d 451 (1976); *Wolff v. McDonnell,* 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975–76, 41 L.Ed.2d 935 (1974), the interest must be something more than the restrictions ordinarily contemplated by a prison sentence. *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The interests created by state prison regulations will be "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* (citations omitted).

The Court finds that neither the prison's grooming standards nor the memorandum regarding enforcement of the grooming policy create a protected liberty interest.[3] In light of *Sandin,* which post dates the Magistrate Judge's Findings and Recommendation, the Court finds that enforcement of the grooming standards does not impose sufficiently "atypical or significant hardship" to justify due process protection.

**3. Equal Protection Clause**

The Court has reviewed Plaintiff's Equal Protection claim. The Court agrees with the Magistrate Judge that Plaintiff has not presented evidence tending to show intentional discrimination. Moreover, Plaintiff has not established which Defendants engaged in the discriminatory conduct. However, although Defendants requested summary judgment on "any and all" claims, they did not address Plaintiff's Equal Protection claim in their memorandum. Because Defendants failed to

---

**3.** Plaintiff objects to the Magistrate's citation of the RAD Unit Inmate Guidelines as the grooming policy at issue in this action. Rather, Plaintiff states that he is only objecting to the memorandum regarding enforcement of the grooming policy issued by John Smythe on 10/27/93. This memorandum states:

Effective immediately, the grooming standards as described in the Inmate Guide are to be adhered to and, if need, enforced. Specifically, there are no exceptions to hair length and/or beards for religious reasons.

meet their initial burden of identifying for the Court the portions of the materials on file that they believe demonstrate the absence of any genuine issue of material fact, Plaintiff was not required to come forward with additional evidence. *See T.W. Electrical. Serv.,* 809 F.2d at 630.

■ Because Plaintiff is proceeding *in forma pauperis,* the Court may dismiss any claims which lack an arguable basis either in law or fact. 28 U.S.C. § 1915(d); *Denton v. Hernandez,* 504 U.S. 25, 31–35, 112 S.Ct. 1728, 1733–34, 118 L.Ed.2d 340 (1992); *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 1831–32, 104 L.Ed.2d 338 (1989); *McKeever v. Block,* 932 F.2d 795, 798 (9th Cir.1991). As the Supreme Court stated in *Denton,* a district court may dismiss a case filed *in forma pauperis* as frivolous if the facts alleged are "clearly baseless," a category encompassing allegations that are fanciful, fantastic, and delusional. 504 U.S. at 31–35, 112 S.Ct. at 1733–34.

■ The Court does not find Plaintiff's Equal Protection claim to be frivolous. In his complaint, Plaintiff alleges that Defendants discriminated against him by requiring him to have his hair cut while permitting members of other religious sects (i.e. Hawaiians, who Plaintiff asserts constitute a religious sect) and women to wear long hair and permitting Muslims to wear beards. Construed in a light most favorable to Plaintiff, the Court finds that these allegations could support an equal protection claim.

### 4. State Law Claims

■ Plaintiff alleges that Defendants violated Hawaii Administrative Rules §§ 17–206–1 and 17–203–16 and committed acts of negligence and infliction of emotional distress in violation of state tort law. In so far as Plaintiff alleges these claims against the State of Hawaii or other Defendants in their official capacities, the claims are barred by the Eleventh Amendment. *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 120, 104 S.Ct. 900, 918–19, 79 L.Ed.2d 67

(1984). Where Plaintiff alleges violations of state law, this immunity does not depend on the nature of the relief sought—claims for monetary damage or injunctive relief are equally barred.[4] *Id.* at 104–06, 104 S.Ct. at 910–11 ("it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law"); *see also Papasan v. Allain,* 478 U.S. 265, 277, 106 S.Ct. 2932, 2939–40, 92 L.Ed.2d 209 (1986) (Eleventh Amendment not foreclosed where the official action is asserted to be illegal as a matter of state law alone). This Eleventh Amendment immunity, however, is limited to Plaintiff's claims against the state officials in their official capacities. To the extent that Plaintiff has sued the officials as individuals the Eleventh Amendment affords them no protection.

■ The Court further finds that Defendants have not waived their Eleventh Amendment immunity. To waive Eleventh Amendment immunity, a state must give an "unequivocal indication" that it consents to suit in federal court. *Charley's Taxi Radio Dispatch v. SIDA of Hawaii,* 810 F.2d 869, 873 (9th Cir.1987) (citing *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)). The Ninth Circuit explained that such indication is found where: (1) the state expressly consents to federal jurisdiction in the context of the litigation; (2) a state statute or constitutional provision expressly provides for suit in federal court; or (3) Congress clearly intends to condition the state's participation in a program or activity on the state's waiver of immunity. *Id.* In the case at bar, the state has not consented to federal jurisdiction over Plaintiff's state law claims. In fact, the state has expressly invoked its Eleventh Amendment immunity. Moreover, Hawaii's Tort Liability Act does not authorize suit in federal court. H.R.S. § 662–3 ("The circuit courts of the State and . . . the state district courts shall have original jurisdiction of all tort actions on claims against the State.")

---

4. The Court notes that with respect to Plaintiff's federal claims, the Eleventh Amendment does not bar Plaintiff from seeking prospective injunctive relief against a state official acting in his or her official capacity. *See Papasan v. Allain,* 478 U.S. 265, 276–77, 106 S.Ct. 2932, 2939–40, 92 L.Ed.2d 209 (1986); *Ulaleo v. Paty,* 902 F.2d 1395, 1398 (9th Cir.1990).

With respect to Defendants in their individual capacities, the Court agrees with the Magistrate Judge that this Court has pendant jurisdiction over these claims. However, the Court finds that Plaintiff's state law claims are all either subsumed within Plaintiff's federal claims or are insufficient to state a claim.

■ Administrative Rules §§ 17–206–1 and 17–206–2 recognize that inmates may bring an action for personal damages against prison officials in their individual capacity pursuant to 42 U.S.C. § 1983, but that the officials may be protected by qualified immunity. Accordingly, Plaintiff's claim pursuant to this rule is simply another method of alleging his § 1983 claim. The Court will thus treat this claim as subsumed within Plaintiff's § 1983 claim.

Administrative Rule § 17–203–16 provides that:

> No inmate or ward may be denied an opportunity to maintain his religious beliefs. However, religious beliefs may not be used to subvert correctional goals or interfere with the order and security of the facility. Thus, there should be a reasonable accommodation between religious beliefs and correctional goals.

The Court finds that Defendants' refusal to except Plaintiff from the prison's grooming standard based on his religious beliefs did not violate this Rule.[5] This Court previously held that Hawaii's hair-cutting regulation was logically connected to the State's legitimate concerns of cleanliness, security, and safety. *Allen v. Sakai*, Cv. 86–00577 ACK, Order Filed March 28, 1989. The Court found that permitting an exception to the hair length policy for religious beliefs would adversely impact prison personnel and prison resources. *Id.* The Court stated that searching a prisoner's hair for weapons or contraband would be a time-consuming and burdensome task if the prisoner's hair is long and that longer searches would create more of an opportunity for personal confrontations between inmates and prison guards. *Id.* The Court also found that if prisoners were permitted to have long hair, the prison might

have to establish procedures to ensure that their hair remains clean and free of lice. It was conceivable that these additional procedures would again burden prison resources and create enhanced opportunities for personal confrontations between inmates and guards. The Court further found that it was conceivable that allowing special accommodations would create an appearance of favoritism that could result in resentment and unrest in other inmates. *Id.* Because excepting Plaintiff from the grooming policy would thus interfere with the order and security of the facility, the Court finds that Defendants' did not violate § 17–203–16 when they cut Plaintiff's hair.

The Court also finds that Plaintiff has not alleged any facts establishing a separate cause of action based on negligence or infliction of emotional distress. Plaintiff states that Defendants negligently failed to recognize the RFRA, the Bill of Rights and the First and Fourteenth Amendments, causing Plaintiff to suffer extreme emotional distress and other damages. Plaintiff also alleges that in failing to follow the Constitution and laws enacted pursuant to the Constitution, Defendants intentionally inflicted extreme emotional distress upon Plaintiff. The Court finds that because Plaintiff's claims of emotional distress arise from Defendants' violation of his constitutional rights, the claims simply relate to damages for the constitutional violations rather than additional causes of action. Accordingly, the Court will treat Plaintiff's allegations that he suffered emotional distress as claims for damages in connection with his claims under the RFRA and the First, Fifth and Fourteenth Amendments to the Constitution.

■ Moreover, the Court agrees with the Magistrate Judge that Plaintiff has not alleged sufficient facts to establish the essential elements of his claim that Defendants intentionally inflicted emotional distress upon Plaintiff. Plaintiff alleges that Defendants merely complied with prison policy. Consequently, he failed to establish the extreme and outrageous conduct necessary to state a claim of intentional infliction of emotional distress. *See Nelsen v. Research Corp. of the*

---

**5.** However, the Court notes that this Administrative Rule is inconsistent with the RFRA.

*Univ. of Hawaii,* 805 F.Supp. 837 (D.Haw. 1992).

### C. *42 U.S.C. § 1983*

■ Plaintiff objects to the Magistrate Judge's finding that certain Defendants are not liable because they were not directly involved in the incident. Plaintiff contends that all Defendants are liable because they helped devise and implement the enforcement memorandum.[6] The memorandum indicates that it was generated by John Smythe and that copies were sent to various other Defendants. The Court agrees with Plaintiff that these individuals would generally be subject to liability to the extent that they aided in promulgating or enforcing the policy.[7] However, insofar as the allegations pertain to the enactment of the grooming standards and enforcement policy, Defendants are entitled to absolute immunity. Such actions involve the formulation of policy and apply to the prison community at large. *Kuzinich v. County of Santa Clara,* 689 F.2d 1345, 1349 (9th Cir.1982) (legislators who voted to enact a general zoning ordinance were entitled to absolute immunity). Because Plaintiff does not allege that Defendants, Smythe, Reynolds, Sequeira, Pikini, Sandin, Kaplan and Manumaleuna were involved in enforcing the policies, this immunity precludes all claims raised against these Defendants.

■ Plaintiff's section 1983 claims for monetary relief against the State of Hawaii and the Defendants in their official capacities are also barred by the Eleventh Amendment. Federal claims against States are generally only permitted if there is congressional authorization of the suit. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 452, 96 S.Ct. 2666, 2669–70, 49 L.Ed.2d 614 (1976). The United States Supreme Court has specifically held that the Civil Rights Act of 1871, 42 U.S.C. § 1983, excludes States as parties defendant in § 1983 actions. Moreover, because an official-capacity suit is simply another way of pleading an action against a legal entity of which the officer is an agent, and is thus treated as a suit against the entity, Defendants in their official capacities are also excluded from actions under § 1983. *See Monell v. Department of Social Services,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978); *Kentucky v. Graham,* 473 U.S. 159, 167, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985).

■ Plaintiff's § 1983 claims for prospective injunctive or declaratory relief against the state officials in their official capacities, however, are not barred by the Eleventh Amendment. Nor are Plaintiff's claims for monetary relief against the state officials in their individual capacities.

### D. *Qualified Immunity*

■ The Court finds that Defendants are entitled to qualified immunity with respect to Plaintiff's claim under the RFRA insofar as it is alleged against Defendants in their individual capacities. Government officials performing discretionary functions within the scope of their authority are protected from liability for civil damages unless the law clearly proscribes the actions they took. *Eg., Harlow v. Fitzgerald,* 457 U.S. 800, 817–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Anderson v. Creighton,* 483 U.S. 635, 639–41, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Whether an official is immune "turns on the

---

**6.** In his complaint, Plaintiff alleges that Defendants Hall, Smythe, Reynolds, Sequeira, Pikini, Sandin, Kaplan and Manumaleuna had the duty to devise and implement new rules, regulations, policies and procedures. He does not allege that Defendant Mello, an adult corrections officer, Defendant Dunnaway, a case worker, or Defendant Sumner (now deceased and substituted with Defendant George Iranon for purposes of claims in his official capacity) had such authority. The Court has reviewed Plaintiff's complaint and the evidence before this Court and agrees with the Magistrate Judge that Plaintiff has not alleged any facts sufficient to establish that Defendants Mellow or Dunnaway were personally involved

with any alleged deprivation of Plaintiff's constitutional rights. Likewise, because the doctrine of respondeat superior is not applicable to actions under 42 U.S.C. § 1983, Plaintiff has failed to allege that Sumner was personally involved in any alleged deprivations.

**7.** The Court notes that Defendants do not explicitly deny involvement in these activities in their brief supporting their motion for summary judgment. Rather, they argue that Plaintiff cannot base a claim against Defendants on inadequate supervision and training.

objective reasonableness of their conduct in light of clearly established law, not on their subjective good faith." *Bateson v. Geisse,* 857 F.2d 1300, 1304 (9th Cir.1988). An official who acts in good faith will only be held liable where the unlawfulness of the official's actions would have been apparent to a reasonable official in light of pre-existing law. *Anderson,* 483 U.S. at 639–41, 107 S.Ct. at 3039; *Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 580 (9th Cir.1984). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 340–42, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

■ In order to avoid a claim of qualified immunity, the plaintiff must prove that the law clearly established that the official's actions were unlawful at the time of the alleged misconduct. *Romero v. Kitsap County,* 931 F.2d 624, 627 (9th Cir.1991); *Han v. Department of Justice,* 824 F.Supp. 1480, 1491 (D.Hawaii 1993). To defeat summary judgment based on qualified immunity, the plaintiff "must produce evidence that would allow a fact-finder to find that no reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts." *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir. 1993).

■ Plaintiff contends that Defendants are not entitled to qualified immunity because the RFRA was effective when Defendants required him to have his hair cut. This argument necessarily assumes that the prison's enforcement of its grooming standard violates the RFRA and that such violation would have been apparent to a reasonable official. The Court does not agree that such assumptions are either obvious or correct. As discussed above, this Court previously held that the Hawaii prison's haircutting regulation was logically connected to the state's legitimate concerns of cleanliness, security, and safety. *Allen v. Sakai,* Cv. 86–00577 ACK, Order Filed March 28, 1989; *see also, Iron Eyes v. Henry,* 907 F.2d 810 (8th Cir.1990); *Pollock v. Marshall,* 845 F.2d 656 (6th Cir.1988). It remains to be seen whether such concerns satisfy the compelling inter-

est standard set forth in the RFRA. *Compare Phipps v. Parker,* 879 F.Supp. 734, 736 (W.D.Ky.1995) (applying haircutting policy to an orthodox Hasidic Jew was the only plausible means of meeting prison's compelling safety concerns); *with Luckette v. Lewis,* 883 F.Supp. 471 (D.Ariz.1995) (cutting inmate's beard may violate the RFRA); *Hamilton v. Schriro,* 863 F.Supp. 1019, 1024 (W.D.Mo. 1994) (Magistrate Judge found that hair length regulations burdened the exercise of the plaintiff's religion under RFRA).

In light of this Court's ruling in *Allen,* the Court finds that Defendants reasonably could have believed that their conduct was lawful. Defendants subsequent modification of their grooming standard pending vindication of their prior standard does not alter this finding. Defendants cannot be faulted for taking precautionary measures aimed at avoiding additional litigation and possible liability pending resolution of this issue.

The Court further finds that Defendants are not entitled to qualified immunity with respect to Plaintiff's allegations that Defendants discriminated against Plaintiff in violation of the Equal Protection Clause. If Defendants intentionally discriminated against Plaintiff as alleged, the unlawfulness of such actions would have been apparent to a reasonable official.

## II. RELIGIOUS FREEDOM RESTORATION ACT

■ Any analysis into the constitutionality of a statute must start with the presumption that the statute is constitutional. *See United States v. National Dairy Prods. Corp.,* 372 U.S. 29, 32, 83 S.Ct. 594, 597–98, 9 L.Ed.2d 561 (1963); *United States ex rel. Madden v. General Dynamics Corp.,* 4 F.3d 827, 830 (9th Cir.1993). This presumption is at its strongest when Congress has explicitly determined that it had the power to enact the statute. *Rostker v. Goldberg,* 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981). In recommending passage of the RFRA, the Senate and House Committees on the Judiciary expressly found that the Act fell squarely within Congress' enforcement power under Section 5 of the Fourteenth Amendment. S.Rep. No. 103–111, pp. 13–14;

H.Rep. No. 103–88, p. 7. Accordingly, to successfully challenge the RFRA, Defendants must overcome the presumption that the Act is constitutional.

Most Courts that have addressed the constitutionality of the RFRA have found that Congress, in enacting the RFRA, acted within the scope of its enforcement powers under Section 5 of the Fourteenth Amendment. *Belgard v. State of Hawaii,* 883 F.Supp. 510, 513 (D.Haw.1995); *Sasnett v. Department of Corrections of the State of Wisconsin,* 891 F.Supp. 1305 (W.D.Wis.1995); *Coronel v. State of Hawaii,* Civil No. 93–00165 ACK (1995) (Court adopted Magistrate Judge's Recommendation that the RFRA was constitutional; because the Magistrate Judge ultimately found in favor of the State, the State did not file an objection to the Magistrate Judge's finding that the RFRA was constitutional); *but see Flores v. City of Boerne,* 877 F.Supp. 355, 357 (W.D.Tex.1995) (holding that the Congress violated the doctrine of Separation of Powers by intruding on the power and duty of the judiciary). These courts rely on *Katzenbach v. Morgan,* in which the United States Supreme Court recognized that Section 5 grants Congress broad remedial power to enact "whatever legislation is appropriate . . . to carry out the objects the amendments have in view." 384 U.S. 641, 650, 86 S.Ct. 1717, 1723, 16 L.Ed.2d 828 (1966) (quoting *Strauder v. West Virginia,* 100 U.S. 303, 311, 25 L.Ed. 664 (1879)). "Correctly viewed, § 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." *Id.* 384 U.S. at 651, 86 S.Ct. at 1723–24. Congress is not limited to remedying actions which the judiciary would find violates the Constitution. Rather, Congress has the authority to enact laws which it determines (1) protects a right guaranteed by the Fourteenth Amendment; (2) is plainly adapted to securing that right; and (3) which is not prohibited by but is consistent with the letter and spirit of the Constitution. *Id.* at 651, 86 S.Ct. at 1723–24; *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). In other words, under § 5, Congress may enact legislation that is "constitutionally overinclu-

sive" without violating the separation of powers doctrine. *City of Rome v. United States,* 446 U.S. 156, 176, 100 S.Ct. 1548, 1561, 64 L.Ed.2d 119 (1980) (Rehnquist, J., dissenting); *accord id.* at 175–78, 100 S.Ct. at 1560–62 (majority affirming breadth of § 5). Congress may erect a statutory buffer zone around an established constitutional right into which the government cannot intrude, as a means of ensuring the full enjoyment of the underlying or "core" right. *Katzenbach v. Morgan,* 384 U.S. at 652, 86 S.Ct. at 1724.

Defendants do not dispute that Section 5 of the Fourteenth Amendment grants Congress the power to enact laws in aid of all of the other amendments which have been "incorporated" into the Fourteenth Amendment, including the First Amendment. Defendants' Memorandum in Support of Motion, filed January 30, 1995, p. 11; *see also Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (civil rights attorney's fees award statute, 42 U.S.C. § 1988, upheld as valid exercise of Congress' power under § 5 as applied to litigation of Eighth Amendment claim); *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940) ("concept of liberty embodied in th[e Fourteenth] Amendment embraces the liberties guaranteed by the First Amendment"). Instead, Defendants argue Congress exceeded this power in enacting the RFRA because in so doing Congress effectively reversed the United States Supreme Court's decision in *Employment Division, Department of Human Resources, State of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). According to Defendants, Congress' enactment of a statute that effectively reverses the Supreme Court impermissibly intrudes upon the function of the judicial branch.

Defendants do not cite any cases supporting their argument that Congress exceeds its Section 5 power where it acts in response to a decision of the United States Supreme Court. Rather, Defendants apparently rely on the basic principles underlying the doctrine of Separation of Powers. The only court to have found merit in Defendants' argument reasoned that the Supreme Court's directive that "[i]t is emphatically the prov-

ince and duty of the judicial department to say what the law is" prohibits Congress from "overturning" an interpretation of the United States Constitution by the Supreme Court. *Flores,* 877 F.Supp. at 357 (quoting *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803)).

The Court does not agree that *Marbury v. Madison* commands such a conclusion. The *Marbury v. Madison* Court held that it was the province of the courts to determine the constitutionality of the laws which they were applying. 5 U.S. at 178. The Court reasoned that "those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each." *Id.* If a law conflicts with the Constitution, and both the law and the Constitution are applicable to a case, then the Constitution must govern the case. *Id.*

An application of the RFRA does not necessarily "conflict" with the Supreme Court's interpretation of the First Amendment. Congress stated that the RFRA:

> does not purport to legislate the standard of review to be applied by the federal courts in cases brought under [the Free Exercise Clause]. Instead, it creates a new statutory prohibition on governmental action that substantially burdens the free exercise of religion, except where such action is the least restrictive means of furthering a compelling governmental interest.

S.Rep. No. 103–111, p. 14, n. 43. The RFRA simply provides greater protection of an individual's right to freely exercise his religion than the Supreme Court has afforded under the Constitution. If an action violates the First Amendment, it will also violate the RFRA.

In contrast to the lack of support for Defendants' argument, the Court finds that there is strong support for the United States' argument that Congress can act to protect a constitutional right against conduct which has previously been held constitutional by the Supreme Court. To begin with, the Supreme Court has consistently held that Congress possesses broad remedial and enforce-

ment power under § 5 of the Fourteenth Amendment. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 490, 109 S.Ct. 706, 720, 102 L.Ed.2d 854 (1989) ("the power to 'enforce' may at times also include the power to define situations which Congress determines threaten principles of equality and to adopt prophylactic rules to deal with those situations"); *Fullilove v. Klutznick,* 448 U.S. 448, 483, 100 S.Ct. 2758, 2777, 65 L.Ed.2d 902 (1980) ("it is fundamental that in no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees"). This broad power includes the ability to enact laws "plainly adapted to [the] end of enforcing the Equal Protection Clause [which are not] prohibited by but [are] consistent with the letter and spirit of the Constitution, regardless of whether the practices outlawed by Congress in themselves violated the Equal Protection Clause." *City of Rome,* 446 U.S. at 176, 100 S.Ct. at 1561 (internal quotes omitted); *see also Oregon v. Mitchell,* 400 U.S. 112, 132–33, 91 S.Ct. 260, 268–69, 27 L.Ed.2d 272 (1970); *Katzenbach v. Morgan,* 384 U.S. at 651, 86 S.Ct. at 1723–24.

The cases providing the strongest support for the United States' argument involve challenges to the Voting Rights Act. The voting rights cases raised issues similar to the issues raised in this case because the Voting Rights Act prohibited voting practices in the absence of any judicially defined constitutional wrongdoing and despite the fact that the United States Supreme Court had previously upheld similar practices. *Katzenbach v. Morgan,* 384 U.S. at 652, 86 S.Ct. at 1724 (upholding § 4(e) of the Voting Rights Act, prohibiting certain applications of state voter literacy requirements, as a valid exercise of § 5 even though the Supreme Court had upheld similar literacy tests in *Lassiter v. Northampton Election Bd.,* 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959)); *Oregon v. Mitchell,* 400 U.S. at 132–34, 91 S.Ct. at 268–70 (upholding provision of the Voting Rights Act, imposing a 5–year ban on all literacy tests, as a valid exercise of § 5 even though the Court had previously upheld a literacy

test in *Lassiter* ); *see also, City of Rome,* 446 U.S. at 176–78, 100 S.Ct. at 1561–62 (upholding § 5 of the Voting Rights Act, prohibiting electoral system changes that carry a racially discriminatory impact, as a valid exercise of Congress' power under § 2 of the Fifteenth Amendment notwithstanding the Supreme Court's construction of the Fifteenth Amendment as prohibiting only those voting schemes that are motivated by an intent to discriminate).

Defendants argue that *Katzenbach v. Morgan* does not support the United States' argument because the Supreme Court's previous decision in *Lassiter* upheld a general literacy test while *Katzenbach v. Morgan* upheld the Voting Rights Act of 1965's prohibition of English-language literacy tests. According to Defendants, the Voting Rights Act of 1965 did not conflict with the Court's ruling in *Lassiter* because the Court could have found that while "it did not offend the equal protection clause to disenfranchise the illiterate; disenfranchising the non-English speaking might." Even if the Court were to accept such a narrow interpretation of *Katzenbach v. Morgan,* this does not explain why the Supreme Court subsequently upheld the 1970 Amendments which abolished all literacy tests without overruling *Lassiter.* Nor does Defendants' contention that the 1970 amendments "did nothing more than reflect the then-current thinking of the court" explain the Supreme Court's failure to overrule *Lassiter.* See Defendants Statement of Objections to Findings and Recommendations, Filed June 12, 1995, p. 6 n. 6. Defendants cite to Justice Brennan's concurrence in *Oregon v. Mitchell,* where he states:

> Although we had previously concluded that literacy tests, fairly administered, violated neither the Fourteenth nor the Fifteenth Amendment, *Lassiter v. Northampton Election Board,* 360 U.S. 45 [79 S.Ct. 985, 3 L.Ed.2d 1072] (1959), we nevertheless upheld their selective proscription by Congress. *South Carolina v. Katzenbach,* 383 U.S. 301 [86 S.Ct. 803, 15 L.Ed.2d 769] (1966). Canvassing the "voluminous" legislative history of the 1965 Act, we found ample basis for a legislative conclusion that such a proscription was necessary to combat the "insidious and pervasive evil" of

racial discrimination with regard to voting. *Id.,* at 327–334 [86 S.Ct. at 808]. Three years later in *Gaston County v. United States,* 395 U.S. 285 [89 S.Ct. 1720, 23 L.Ed.2d 309] (1969), we sustained application of the ban on literacy tests to a county where there was no evidence that the test itself was discriminatory or that—at least since 1962—it had been administered in a discriminatory manner. Notwithstanding this fact, we noted that the record did contain substantial evidence that in years past 'Gaston County [had] systematically deprived its black citizens of the educational opportunities it granted to its white citizens.' *Id.,* at 297 [89 S.Ct. at 1726]. Since this 'in turn deprived them of an equal chance to pass the literacy test,' *id.,* at 291 [89 S.Ct. at 1723], even impartial administration of an impartial test would inevitably result in just the discrimination that Congress and the Fifteenth Amendment had sought to proscribe. *Id.,* at 296–97 [89 S.Ct. at 1725–26]; *see South Carolina v. Katzenbach,* 383 U.S., at 308, 333–334 [86 S.Ct. at 808, 821–822].

400 U.S. at 232–33, 91 S.Ct. at 318–19. Defendants argue that this text "makes it clear that the Voting Rights Act Amendments are clearly consistent with the court's post-Lassiter jurisprudence." Defendants Memorandum in Support of Motion, filed January 30, 1995, p. 14. The Court finds that Justice Brennan's opinion could just as easily support a conclusion that the Supreme Court's post-Voting Rights Act jurisprudence was consistent with Congress' prophylactic proscription of literacy tests.

As late as 1980, the Supreme Court, in a departure from its earlier approach in *White v. Regester,* 412 U.S. 755, 765–66, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973), held that a voting practice's discriminatory effect, standing alone, does not violate the Fourteenth or Fifteenth Amendment. *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). In response, Congress amended the Voting Rights Act "to make clear that a violation could be proved by showing discriminatory effect," effectively overturning *Bolden. Thornburg v. Gingles,* 478 U.S. 30, 35, 106 S.Ct. 2752, 2758, 92

L.Ed.2d 25 (1986). Although the Supreme Court acknowledged that Congress' action "was largely a response to this Court's plurality opinion in [*Bolden* ]," it enforced the statutory restoration of the Supreme Court's previous equal protection standard without any separation of powers concerns. *Id.* Defendants suggest that the Supreme Court simply acquiesced in Congress' action because it "was ready to repudiate *Bolden,* or at least ready to adopt the same constitutional judgment as Congress." Again, however, this argument does not explain why the Supreme Court did not overrule *Bolden.* Moreover, such speculation is insufficient to overcome the support which the *Regester–Bolden–Gingles* trilogy and other voting rights cases provide for congressional authority to enact the RFRA, particularly in light of the presumption of constitutionality that attaches to acts of Congress.

Defendants do not dispute that the RFRA is "plainly adapted" to enforcing the First Amendment, and thus, through the process of incorporation, the Fourteenth Amendment. Rather, they argue that the RFRA impermissibly strengthens the right to free exercise of religion at the expense of other rights. To support their argument Defendants expound upon numerous situations in which they contend other rights might be diluted or abrogated by the enforcement of the RFRA, including RFRA challenges to the Age Discrimination in Employment Act ("ADEA"), *Powell v. Stafford,* 859 F.Supp. 1343 (D.Colo.1994), the Freedom of Access to Clinic Entrances Act ("FACE"), *Council for Life Coalition v. Reno,* 856 F.Supp. 1422 (S.D.Calif.1994), fair housing laws, *Smith v. Fair Employment and Housing Commission,* 34 Cal.App.4th 1708, 30 Cal.Rptr.2d 395 (3rd Dist.1994), and a school district's policy prohibiting the carrying of weapons on campus, *Cheema v. Thompson,* 36 F.3d 1102 (9th Cir.1994) (unpublished disposition). According to Defendants, whether these challenges are successful is not significant.[8] Rather, the

mere possibility that RFRA might result "in a reduction in civil liberty for some" means that the Act is unconstitutional.

■■■ The Court does not agree. As the Magistrate Judge indicates, the State, in advancing this argument, launches a facial challenge to the RFRA; it presents no argument that the RFRA violates any other constitutional rights in the instant case. To successfully assert a facial attack of a statute, the challenger must "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). Defendants cannot meet this burden by merely reciting potential circumstances under which the RFRA may abrogate or dilute other rights.

The plain language of the Act relieves the government of any obligation to accommodate the religious claimant where the state has a compelling interest. A state's interest in avoiding constitutional violations constitutes such a compelling interest. *See Hsu v. Roslyn Union Free School District,* 876 F.Supp. 445, 462 (E.D.N.Y.1995) (holding that school's nondiscrimination policy is a compelling interest that obviates need to accommodate religious exercise under RFRA); *cf. Bob Jones Univ. v. United States,* 461 U.S. 574, 602–04, 103 S.Ct. 2017, 2034–35, 76 L.Ed.2d 157 (1983) (elimination of racial discrimination is a compelling interest that outweighs burden on free exercise rights). Moreover, courts are compelled to construe the RFRA in a way that avoids constitutional problems. *See Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust For Southern California,* —— U.S. ——, ——, 113 S.Ct. 2264, 2283, 124 L.Ed.2d 539 (1993) ("where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress").

---

8. Indeed, in *Council for Life Coalition,* a case cited by Defendants, the court held that "even assuming that FACE substantially burdened plaintiffs' exercise of religion, application of that burden is in furtherance of a compelling governmental interest and is the least restrictive means

of furthering that compelling interest. Congress unquestionably has a compelling interest in prohibiting the use of force and threats of force and physical obstruction of facilities providing reproductive health services." 856 F.Supp. at 1430.

**1234**

■ In conclusion, the Court agrees with the Magistrate Judge, and the majority of federal courts that have addressed this issue, that Congress, in enacting the RFRA, acted within the scope of its authority under Section 5 of the Fourteenth Amendment. Furthermore, the Court finds that the Magistrate Judge was not clearly erroneous in finding that there are factual disputes as to Plaintiff's claim under the RFRA that preclude summary judgment.[9]

The Court adopts the findings and recommendations of the Magistrate Judge except as otherwise modified hereinbefore. After reviewing the record, the Court is satisfied that the remaining findings are not clearly erroneous.

### CONCLUSION

For the foregoing reasons, the Court MODIFIES in part and ADOPTS in part the Magistrate's findings and recommendation. The Court finds that the RFRA is constitutional; that Plaintiff's right to Due Process was not violated; that the Eleventh Amendment bars Plaintiff's state law claims against the State of Hawaii and other Defendants in their official capacities; that Plaintiff's state law claims against Defendants in their individual capacities are either subsumed within his federal claims or are insufficient to state a claim; that Plaintiff failed to allege personal involvement with any alleged deprivation of his constitutional rights by Defendants Mello and Dunnaway; that Defendants are entitled to absolute immunity insofar as Plaintiff's claims pertain to promulgation of prison policies; that Plaintiff's claims of monetary damages against the State of Hawaii and other Defendants in their official capacity are barred by the Eleventh Amendment; that Defendants in their individual capacities are entitled to qualified immunity on Plaintiff's claims that Defendants violated the RFRA; and that Plaintiff is not entitled to an injunction permitting anyone with long hair to be admitted into workline nor an injunction modifying his sentence to a suspended sentence to one year time served.

Plaintiff's motion for summary judgment is hereby DENIED. Defendants' cross motion for summary judgment is hereby GRANTED in part and DENIED in part. The only claims remaining for trial are as follows:

(1) Plaintiff's request for a declaration that Defendants' actions violated his right to freely exercise his religion pursuant to the standard set forth in the RFRA.[10]

(2) Plaintiff's request for a declaration that Defendants' actions violated the Equal Protection Clause and for monetary damages against Defendants' Ching, Tenn, Palau and Hall in their individual capacities based on any violation of Plaintiff's right to Equal Protection.

After reviewing the briefs on file and the applicable law, the Court is of the opinion that Congress acted within its authority under Section 5 of the Fourteenth Amendment in enacting the RFRA. The Court, however, is also of the opinion that this order holding the RFRA to be constitutional "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of litigation ..." 28 U.S.C. § 1292(b). In particular, the Court notes that the standard of proof to be applied at trial depends on the constitutionality of the Act. Moreover, under pre-enactment case law, it is doubtful that Plaintiff's claims that Defendants violated his right to freely exercise his religion could survive summary judgment. If the Ninth Circuit permits appeal from this order, further proceedings before this Court will be stayed pending the outcome of the appeal.

IT IS SO ORDERED.

---

9. The Court notes that during the legislative hearings, concern was expressed whether the RFRA should apply to prison inmates. However, Congress refrained from providing prisons an exemption from the statute.

10. The Court notes that under current regulations, Plaintiff is permitted to grow his hair long. Therefore, Plaintiff is not seeking injunctive relief with respect to the prison's grooming standards.